STATE OF NEBRASKA, APPELLEE, V.
HERSCHEL J. SMITH, APPELLANT.

308 N.W.2d 820

Filed July 24, 1981.   No. 43180.

Thomas M. Kenney, Douglas County Public Defender, and Stanley A. Krieger for appellant.

Paul L. Douglas, Attorney General, and Mark D. Starr for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, BRODKEY, WHITE, and HASTINGS, JJ., and COLWELL, Retired District Judge.

HASTINGS, J.

The defendant, Herschel J. Smith, was convicted by a jury of robbery of a liquor store and was sentenced by

the District Court for Douglas County to serve 5 to 7 years in the Nebraska Penal and Correctional Complex. The only assignment of error is that the District Court erred in failing to suppress the confessions given by the defendant, based on an unlawful arrest. We affirm.

On August 24, 1979, a black male entered Bricks Liquor Store at about 11:10 p.m., and asked the owner, Edward Adam, for some beer. As Mr. Adam bent down to reach for the beer, he observed two more black males enter the store, and one pulled out a gun, went toward Mrs. Adam, who was in the back of the store, and told her to hang up the telephone receiver. The third man had what the Adams described as a sawed-off shotgun, and what the defendant has described as a stick made to look like a shotgun. Mr. Adam was told to open the cash register, which he did, and the money was placed in a paper sack. One of the men grabbed some cigarettes, and the three ran out the back door of the store.

A man who was in his pickup saw the three men running down the alley and began to chase them. After driving down the alley the man apparently lost track of them, although while circling around the block he noticed one black male in a car which hurriedly pulled out of a nearby parking lot. The witness gave the description of the vehicle and the license number to police officers. The automobile was traced and found to belong to Billy Berrian.

Berrian was arrested on Sunday, August 26, 1979, for suspicion of robbery, and identified another person who was involved in the robbery, known to him as "Hershey." Berrian told officers that he did not know Hershey's last name, but did know where he lived, although he could not give the exact address. On Monday, August 27, police officers drove Berrian to a house which he pointed out as Hershey's residence. The police took Berrian back to the detention center and returned to the neighborhood, where they questioned neighbors and learned that a family named Smith lived

at that address. On Tuesday, August 28, at approximately 8:10 a.m., three officers went to the Smith residence to arrest Herschel Smith. The officers did not secure an arrest warrant, although they believed that at that time they had enough information to arrest Herschel.

Two officers went to the front door and one went to the back. The officers knocked on the front door, and it was opened by Samuel Smith, Herschel's younger brother. The officers entered the house and began searching the residence for Herschel Smith. Samuel Smith testified that he assumed the men entering the house were police officers, although they were dressed in plain suits and did not identify themselves. He repeatedly asked them if they had a warrant to search his mother's house, although he did not know what the purpose of their visit was. The officers did not answer Samuel's questions and they told him to sit down and shut up. Within a few minutes, Herschel emerged from the bedroom where he had been sleeping and told officers to stop harassing his little brother. The officers then arrested Herschel and allowed him to get dressed before transporting him to police headquarters. The defendant was informed of his *Miranda* rights and he agreed to talk about the robbery. At approximately 9:10 a.m., Herschel gave a taped statement describing his involvement in the incident.

The next day, Wednesday, August 29, at approximately 9:27 a.m., police officers again informed the defendant of his rights and again took a taped statement. About an hour later the police interviewed Berrian regarding the robbery. After the questioning of the two men, police officers determined that there were inconsistencies between the stories regarding the extent of their involvement and the roles they played in the incident. In order to clear up the inconsistencies, the police decided to bring the two men together. It is in dispute as to what occurred at that point in time. According to the officers present, the two men had

about a 5-minute discussion about their respective roles in the incident. According to both defendants, who testified at the suppression hearing, they did not have a discussion of any sort. Berrian stated: "I did not speak to him. Herschel Smith walked in the office and one officer said that Berrian said this and Herschel Smith said he is telling a damn lie, or something like that, and walked away." Smith agreed that the incident occurred the way Berrian described it.

After the two men were separated, Smith again gave a taped statement regarding his involvement in the robbery. According to Officer Frank T. O'Connor, Smith gave the third statement in order to clear up the inconsistencies. "Mr. Smith stated that he wanted to set the record straight and he wanted to tell how it went down and what his participation was in it and what had taken place." The last statement was given after the defendant had been again informed of his *Miranda* rights and agreed to waive them. The second tape was destroyed by officers at the request of the defendant because it was not accurate. The third tape was much more complete than the first tape and for the first time Smith admitted to carrying a stick which was made to resemble a shotgun. The first and the third tapes were admitted into evidence and played for the jury over the objection of defense counsel and after the trial court refused to suppress those statements.

The defense argues on appeal that the two taped confessions should have been suppressed as being fruits of an unlawful arrest and therefore in violation of his constitutional rights. Defendant relies on the recent U.S. Supreme Court decision in *Payton v. New York, Riddick v. New York*, 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980), which held that, absent exigent' circumstances, the fourth amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest. In the case at bar, there was no warrant secured for the defendant's arrest, and no exigent cir-

cumstances existed, as there was ample time to secure a warrant. The State argues on appeal that there was consent given by Samuel Smith when he opened the door to police officers after they knocked. The record does not support the conclusion that there was consent. Only one officer testified that Samuel Smith consented to the officer's search of the house for his brother. That officer was the one stationed at the back door of the house and he did not go in until called by the officers who had gone to the front door. He could not have known what transpired between the two officers and Samuel Smith at the front door after the officers knocked and entered. The State has not met its burden of proving that there was consent by an occupant of the house. Therefore, if *Payton and Riddick* is applicable to this situation, the arrest of the defendant was unlawful.

*Payton and Riddick* was decided some 7½ months after the arrest of the defendant. We believe that it is open to question as to whether or not *Payton and Riddick* is to be applied retroactively. See *Michigan v. DeFillippo*, 443 U.S. 31, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979). However, assuming arguendo that *Payton and Riddick* is controlling, there still remains a reason why this case should be affirmed.

Defendant contends that because the confessions were made pursuant to an unlawful arrest, they therefore were fruits of the poisonous tree which required their suppression. Such a result does not necessarily follow, as we recognized in *State v. Smith*, 207 Neb. 263, 298 N.W.2d 162 (1980). The U.S. Supreme Court has consistently held that not all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police. The question in such a case is whether the evidence objected to has been discovered by exploitation of the primary illegality or has been instead discovered by means sufficiently distinguishable to be purged of the primary taint. *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct.

407, 9 L. Ed. 2d 441 (1963). As the Supreme Court has recognized, it is entirely possible that persons arrested illegally may decide to confess, as an act of free will unaffected by the initial illegality. *Brown v. Illinois*, 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975). "The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, see *Johnson v. Louisiana*, 406 U.S. 356, 365 (1972), and, particularly, the purpose and flagrancy of the official misconduct are all relevant. See *Wong Sun v. United States*, 371 U.S., at 491. The voluntariness of the statement is a threshold requirement." *Brown v. Illinois*, 422 U.S. at 603-04.

The standards to determine admissibility of statements made after an illegal arrest as set forth in *Brown* were reaffirmed recently in *Rawlings v. Kentucky*, 448 U.S. 98, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980). The five factors are: (1) The administration of the *Miranda* warnings to the defendant prior to the statement; (2) The temporal proximity of the arrest and the confession; (3) The intervening circumstances between the initial detention and the challenged statements; (4) The purpose and flagrancy of the official misconduct; and (5) The voluntariness of the statement must be established.

The first statement given by the defendant does not meet the test for admissibility as set forth in *Brown* and *Rawlings*, and should have been suppressed. Although the *Miranda* warnings were given to the defendant prior to the confession and the rights waived, the

temporal proximity of the arrest and the confession is much like the situation in *Brown*. The first statement was separated from the unlawful arrest by approximately 1 hour and there was no intervening event of significance.

The third statement given by defendant, the only other one admitted, was given over 27 hours after the arrest. The *Miranda* warnings were administered to the defendant immediately preceding the statement and were made part of the taped confession. The intervening circumstances were very significant and apparently convinced the defendant to give a more complete statement to clear up inconsistencies. In answer to the question from the interviewer as to whether the confession he was giving was voluntary, Smith answered: "It's a voluntary statement and it's given to the best of my knowledge. I'm not trying, I'm not trying to make it seems like that I'm, you know, just trying to get my ownself off, but I just want the truth, you know. I want my side of the story, 'cause before anybody else, you know, come in here and say, I did this, I did that, you know, which isn't, hey."

It is quite apparent that the final statement was given after the defendant realized that Berrian was telling a different version of the incident and implicating Smith in a manner which Smith wanted cleared up and his "side of the story" known.

The fourth factor to be considered is the purpose and flagrancy of the official misconduct. In this instance, the officers were acting legitimately and under apparent authority of Neb. Rev. Stat. §§ 29-404.02 and 29-411 (Reissue 1979). "Police are charged to enforce laws until and unless they are declared unconstitutional. The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality . . . ." *Michigan v. DeFillippo*, 443 U.S. 31, 38, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979). As was the situation in *Rawlings*, "the conduct of the police here does not rise to the level of conscious or flagrant misconduct requir-

ing prophylactic exclusion of petitioner's statements." *Rawlings v. Kentucky*, 448 U.S. at 110.

The final factor to consider is whether the voluntariness of the confession has been established. The defendant has not argued on appeal that the confession was involuntary. There is no evidence that the defendant was subjected to any threats or promises or that the statement was coerced in any manner whatsoever. The motivating factor appears to be the defendant's desire to get at the truth and make sure his side of the story was told to avoid any untruthful accusations by Berrian. We believe that the final statement given by the defendant meets the test of *Brown* and the primary taint of the unlawful arrest was purged.

Since we have determined that the final statement of the defendant was correctly admitted into evidence and that statement encompassed everything in the first statement given by the defendant, admission of the first statement was not prejudicial and is therefore harmless error. "Where there is one confession by a defendant properly admitted into evidence and there was strong corroborative evidence of the guilt of the defendant, the admission of another confession, even though it should have been excluded upon objection, is harmless error." *Kelley v. State*, 366 So. 2d 1145, 1150 (Ala. Crim. App. 1979).

In a habeas corpus proceeding before the U.S. Supreme Court, the petitioner challenged the introduction at trial of a pretrial confession he made to a police officer posing as a fellow prisoner. "[P]etitioner sought to have his conviction set aside on the ground that the statements he made to police officer Langford should not have been admitted against him. Our review of the record, however, leaves us with no reasonable doubt that the jury at petitioner's 1958 trial would have reached the same verdict without hearing Langford's testimony. . . . [W]e do not close our eyes to the reality of overwhelming evidence of guilt fairly established in the state court 14 years ago by use of evidence not chal-

lenged here; the use of the additional evidence challenged in this proceeding and arguably open to challenge was, beyond reasonable doubt, harmless." *Milton v. Wainwright,* 407 U.S. 371, 377-78, 92 S. Ct. 2174, 33 L. Ed. 2d 1 (1972).

The third statement of the defendant left no question as to his guilt in this instance. Although neither of the victims could identify the robbers, their testimony corroborated in many details the facts related by Smith. The judgment of the District Court is affirmed.

AFFIRMED.

MCCOWN, J., concurs in result.