STATE OF NEBRASKA, APPELLEE, V. JEAN L. ABDOUCH, APPELLANT.

434 N.W.2d 317

Filed January 20, 1989.    No. 88-079.

Thomas M. Kenney, Douglas County Public Defender, and Timothy P. Burns for appellant.

Robert M. Spire, Attorney General, and Donald E. Hyde for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

Shanahan, J.

In a bench trial, Jean L. Abdouch, formerly Jean Fletcher, was convicted on the charge of manufacturing a controlled substance, marijuana, in violation of Neb. Rev. Stat. § 28-416(1)(a) (Cum. Supp. 1986). Abdouch claims that certain physical evidence and her oral statements, made while she was in police custody, were constitutionally inadmissible evidence under the fourth amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution. Before trial, Abdouch moved for suppression of the evidence in question. See Neb. Rev. Stat. §§ 29-115 (suppression of accused's statement) and 29-822 (Reissue 1985) (suppression of physical evidence). The district court overruled Abdouch's suppression motions and, over Abdouch's objection at trial, admitted into evidence the physical evidence and statements which were the subject of Abdouch's suppression motions.

## STANDARDS OF REVIEW

In determining the correctness of a trial court's ruling on a motion to suppress, the Supreme Court will uphold the trial court's findings of fact unless those findings are clearly erroneous. *State v. Blakely*, 227 Neb. 816, 420 N.W.2d 300 (1988). In determining whether a trial court's findings on a motion to suppress are clearly erroneous, the Supreme Court recognizes the trial court as the "trier of fact" and takes into consideration that the trial court has observed witnesses testifying regarding such motion to suppress. *State v. Blakely, supra*. Admission or exclusion of evidence is a matter for the discretion of the trial court, whose ruling on an evidential question will be upheld unless such ruling constitutes an abuse of discretion. *State v. Copple*, 224 Neb. 672, 401 N.W.2d 141 (1987); *State v. Clancy*, 224 Neb. 492, 398 N.W.2d 710 (1987). If police have acted without a search warrant, the State has the burden of proof that the search was conducted under circumstances substantiating the reasonableness of such search or seizure. *State v. Vrtiska*, 225 Neb. 454, 406 N.W.2d 114 (1987).

## BACKDROP FOR THE SEARCH

In April 1979, Terry and Susan Clark, as tenants in common, signed a month-to-month lease for a 7-acre rural tract on a

quarter section near Elkhorn in Douglas County, Nebraska. The leasehold consisted of a house and some outbuildings. Susan left Terry in 1984, after which she never lived on or claimed the leased premises as her residence. However, since 1984 Terry Clark and Abdouch lived together on the leasehold but were not married to each other. Terry and Susan Clark were divorced in June 1985. What effect Clarks' dissolution proceeding may have had on the lease is undisclosed.

Two days after Terry Clark's intestate death on June 15, 1987, Susan Clark, the mother of Terry's 8-year-old son, Lee, unsuccessfully attempted to contact Abdouch by telephone to obtain any of Terry's personal property for the benefit of Lee. There were no probate proceedings relative to Terry Clark's death. In view of her inability to reach Abdouch, Susan Clark contacted the Douglas County Sheriff's Department for assistance in securing Terry Clark's belongings "[t]o make sure there would not be any problems when we went to the farm . . . ."

Sgt. Ronald A. Larson of the Douglas County Sheriff's Department was assigned to accompany Susan Clark to the farmstead which was previously Terry Clark's residence and which was presently occupied by Abdouch as her home. Larson and Deputy Sam Christensen met with Susan Clark and other members of Terry Clark's family at a bowling alley in Elkhorn, where Larson was shown a copy of the 1979 lease to Terry and Susan Clark. Christensen had an arrest warrant for Abdouch on the charge of drunk driving. Although the officers realized that Susan and Terry Clark were divorced, and none of the Clark family had a court order authorizing entry on the leasehold or possession of Terry Clark's personal property, the officers accompanied the Clark family to the farmstead to search for and retrieve Terry Clark's personal property. Neither officer had a search warrant for the premises.

SEARCH OF THE FARMSTEAD

On arrival at Abdouch's residence on June 17, Clarks and the officers found an adult babysitter caring for Abdouch's children in Abdouch's absence. When the babysitter said Abdouch would be returning shortly, Sergeant Larson stated the reason for the officers' presence with the Clark family,

namely, to take possession of Terry Clark's belongings. Without further incident, the Clark family, including Susan Clark, and the officers entered the house and began looking for tools, clothing, miscellaneous household items, and firearms of Terry Clark, which articles were not specifically described or identified with any degree of particularity. Household furnishings belonged to Abdouch.

While members of the Clark family continued to rummage through the house in search of Terry Clark's property, the officers went to a barn, about 50 yards from the house, and, on entering the barn through an open doorway, found two tables comprised of sawhorses and plywood slats. On the tables were 23 plastic trays with paper cups, which contained soil and germinating marijuana seeds, and a plastic bag of marijuana seeds. As the officers left the barn through a side door, they saw six cultivated plots, adjacent to the barn, with seedling marijuana plants in various stages of growth. The officers summoned members of the narcotics unit of the Douglas County Sheriff's Department. Before the narcotics officers arrived, Abdouch returned, was arrested pursuant to the DWI warrant, and was removed to the Douglas County corrections office.

When the narcotics officers arrived, Larson briefed them on his discovery at the barn. During this briefing, Terry Clark's sister-in-law called to the officers, asking them to come to the house because Lee, Terry Clark's 8-year-old son, had something to show the officers. Responding, the officers found the boy, apparently at the door, with a paper grocery sack containing $3^1/2$ pounds of marijuana seeds. Lee went back inside the house and returned shortly with a "bong," a pipe used to smoke marijuana. The officers asked Susan Clark whether they could search the house. According to Deputy William H. Jackson, one of the narcotics officers, entry without a search warrant was not the result of apprehension that potential evidence or contraband might be destroyed or unofficially removed. With Susan Clark's permission, the officers entered the house and commenced their search of its interior. Jackson, searching in the kitchen, found a letter, dated June 15 and presumably written by Abdouch to a person named "Ann," which stated:

Those seeds we got are doin' great. I just pinched them all, fertilized em! Wait' til' you see them. I wish Kevin was comin' with you. (I) We miss him too. He's got to make me another Blues tape. He has the best blues in the world. I tell ya what a tape for the weed. Huh Kevin?! . . . .

Love

Jean.

At some point during the officers' search of the house, Terry Clark's sister-in-law gave Jackson a "Dream Book," which was Abdouch's diary and contained the May 19 entry, "planted dope."

## CUSTODIAL STATEMENTS

Approximately 5 hours after discovery of the contraband, smoking paraphernalia, correspondence, and diary, Jackson arrived at the Douglas County corrections office to interrogate Abdouch about "all the evidence" found at Abdouch's residence. Before the interrogation, Jackson administered the "*Miranda*" warning to Abdouch, who signed a "Rights Advisory Form" and acknowledged receipt of the *Miranda* warning. Early in his interrogation of Abdouch, Jackson recounted the "evidence . . . found on the farm," which included the growing marijuana plants, marijuana seeds, the letter to Ann, and Abdouch's diary. Abdouch never responded until Jackson had finished detailing the evidence obtained at Abdouch's residence, or, as related by Jackson: "[S]he didn't make any comments until I had finished laying out what we had." Abdouch became tearful and asked: "You read my diary?" Jackson responded "yes" and continued interrogating Abdouch, who then admitted her participation in the marijuana production on the farmstead.

## DISPOSITION OF ABDOUCH'S SUPPRESSION MOTION

Abdouch moved for suppression of all physical evidence obtained during the farmstead search and for the additional suppression of her custodial statements, which she claimed were the result of the illegal search. The district court, referring to *Jones v. United States*, 362 U.S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960), correctly found that Abdouch had standing to challenge the search. The court then made other determinations

concerning the constitutional validity of the search of Abdouch's residence. The court found that the State's evidence failed to substantiate that the 1979 farmstead lease to Terry and Susan Clark was still effective when the officers searched the premises. The court concluded that Susan Clark, on account of her dissociation with the leasehold, lacked authority to consent to the search. Consequently, the officers' search, inside the house and at the barn, was conducted without valid authority and, therefore, was an unreasonable search which produced the letter and marijuana material at the barn—evidence which the court ruled was unconstitutionally obtained and inadmissible. The State has not complained, and does not complain, about such suppression.

However, the court found that all items derived through the Clark family's efforts inside the house were produced by "nongovernmental persons," who were not "acting as instruments or agents of the State." Accordingly, the court ruled that the items discovered by the Clark family, namely, the paper sack of marijuana seeds found by Lee, the smoking paraphernalia, and Abdouch's diary, were constitutionally admissible evidence.

Concerning Abdouch's custodial statements, the court found that the statements were "made freely, voluntarily, knowingly and intelligently" to Officer Jackson, were not "the fruit of a poisonous tree," and, therefore, were constitutionally admissible evidence.

In the bench trial of Abdouch, the record for the suppression hearing and other evidence were introduced over Abdouch's renewed objection that the physical evidence in question and her custodial statements resulted from a constitutionally invalid search. The court found Abdouch guilty as charged.

NEBRASKA PROBATE CODE

Before addressing the constitutional question concerning the search of the farmstead, we note that Neb. Rev. Stat. §§ 30-24,125 to 30-24,128 (Reissue 1985) of the Nebraska Probate Code furnish a statutory mechanism and procedure for the "Collection of Personal Property by Affidavit and Summary Administration Procedure for Small Estates." In substance, § 30-24,125 provides that, 30 days after a decedent's

death, a decedent's successor may obtain possession of the decedent's tangible property by presenting to the possessor of the property an affidavit, by or on behalf of the successor, which contains certain statements about the value of the property, the absence of a petition for the appointment of a personal representative, and the successor's entitlement to the decedent's property. As prescribed by § 30-24,126, if the person who has received the affidavit refuses to deliver the decedent's property to the decedent's successor, a proceeding may be brought to obtain delivery of the decedent's property. Apart from collection of a decedent's property by affidavit and the summary administration for small estates, authorized by §§ 30-24,125 et seq., a personal representative, generally, has the right and duty to take possession or control of the decedent's property. See Neb. Rev. Stat. § 30-2470 (Reissue 1985). If the circumstances warrant, a special administrator may be appointed. See Neb. Rev. Stat. § 30-2457 (Reissue 1985). There may be other legal remedies in addition to the foregoing, which are only illustrative.

## GOVERNMENT SEARCHES WITH PRIVATE PERSONS

In response to Abdouch's first assignment of error, namely, constitutional inadmissibility of the articles found by the Clark family, the State contends that members of the Clark family, as private citizens without a police request, found the articles in question, which were delivered to the police and were admissible as evidence obtained without governmental activity. To support its contention, the State relies on *Burdeau v. McDowell*, 256 U.S. 465, 41 S. Ct. 574, 65 L. Ed. 1048 (1921), in which the U.S. Supreme Court held that the fourth amendment does not apply to searches by private parties acting without governmental involvement. In *Burdeau*, the Court stated:

> The Fourth Amendment gives protection against unlawful searches and seizures, and as shown in the previous cases, its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon

other than governmental agencies; as against such authority it was the purpose of the Fourth Amendment to secure the citizen in the right of unmolested occupation of his dwelling and the possession of his property, subject to the right of seizure by process duly issued.

In the present case the record clearly shows that no official of the Federal Government had anything to do with the wrongful seizure of the petitioner's property, or any knowledge thereof until several months after the property had been taken from him . . . . It is manifest that there was no invasion of the security afforded by the Fourth Amendment against unreasonable search and seizure, as whatever wrong was done was the act of individuals in taking the property of another. A portion of the property so taken and held was turned over to the prosecuting officers of the Federal Government.

257 U.S. at 475.

In *State v. Ware*, 219 Neb. 594, 365 N.W.2d 418 (1985), Ware claimed that evidence, found by teachers in their search of his room at Boys Town, was the result of a warrantless search in violation of the fourth amendment. This court in *Ware* expressed:

It is clear that the fourth amendment prohibition against unreasonable searches and seizures is inapplicable to the conduct of private parties. [Citing *Burdeau v. McDowell, supra.*] . . .

. . . .

In the defendant's case there is nothing to indicate that the police participated in or directed the actions of the family teachers. To the contrary, it was the Boys Town employees who asserted their responsibility and willingness to search Ware's room. The uncontroverted testimony is that the teachers instigated and carried out the searches, and the only police response was that "if they wanted to and it was their policy, they could."

In light of these facts there was no agency relationship created by the police. Therefore, the searches of the defendant's residence in Boys Town were conducted by private individuals not subject to the warrant requirement

embodied in the fourth amendment.
219 Neb. at 599-601, 365 N.W.2d at 422-23.

In light of *Burdeau v. McDowell, supra*, this court concluded in *State v. Gundlach*, 192 Neb. 692, 695, 224 N.W.2d 167, 170 (1974): "Unless a private citizen in making a search is acting as an agent for the police, his acts may not be attributed to them." See, also, *State v. Skonberg*, 194 Neb. 550, 551, 233 N.W.2d 919, 920 (1975): "The constitutional provision against unreasonable searches and seizures applies only to governmental agencies and not to private persons." See, further, *State v. Howard*, 184 Neb. 274, 278, 167 N.W.2d 80, 84 (1969): "The protection of the Fourth Amendment is a restriction on governmental action only. [Citing *Burdeau v. McDowell, supra*.]"

To determine whether a private person's search is actually a search by the state depends on whether the private person "must be regarded as having acted as an 'instrument' or agent of the state . . . ." *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). The preceding test to determine governmental involvement in a search with a private person is applicable to questions relative to the fourth amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution.

In *Byars v. United States*, 273 U.S. 28, 47 S. Ct. 248, 71 L. Ed. 520 (1927), state officers, equipped with an invalid search warrant, asked a local "prohibition agent" of the U.S. Treasury Department to accompany them in a search of Byars' residence for contraband liquor and material related to the illegal manufacture of liquor. During the search, the federal agent took possession of counterfeit whiskey stamps found on the premises searched. The trial court overruled Byars' motion to suppress the stamps as evidence obtained during the search, and Byars was convicted of possessing the counterfeit stamps. Rejecting the government's claim that the seized stamps were constitutionally admissible evidence, the Supreme Court stated:

> [T]he court must be vigilant to scrutinize the attendant facts with an eye to detect and a hand to prevent violations of the Constitution by circuitous and indirect methods.

Constitutional provisions for the security of person and property are to be liberally construed . . . .

. . . [T]he federal prohibition agent was not invited to join the state squad as a private person might have been, but was asked to participate and did participate as a federal enforcement officer, upon the chance, which was subsequently realized, that something would be disclosed of official interest to him as such agent. . . . We cannot avoid the conclusion that the participation of the agent in the search was under color of his federal office and that the search in substance and effect was a joint operation of the local and federal officers. In that view, so far as this inquiry is concerned, the effect is the same as though he had engaged in the undertaking as one exclusively his own.

273 U.S. at 32-33.

Approximately 20 years after *Byars*, the Supreme Court decided *Lustig v. United States*, 338 U.S. 74, 69 S. Ct. 1372, 93 L. Ed. 1819 (1949). In *Lustig*, city police summoned Greene, a federal agent, to Lustig's hotel room, where police were engaged in an illegal search after Greene had reported to police that "something was going on" in Lustig's room. When Greene arrived at the hotel room, he examined the evidence in controversy, counterfeit U.S. currency, and, from the discovered counterfeit currency, selected evidence to be used in federal prosecution of Lustig for counterfeiting. The trial court refused to suppress the physical evidence of counterfeiting, which led to Lustig's conviction. In finding that Lustig's conviction was based on constitutionally inadmissible evidence, the Supreme Court set aside Lustig's conviction and stated:

We therefore accept as a fact that Greene did not request the search, that, beyond indicating to the local police that there was something wrong, he was not the moving force of the search, and that the search was not undertaken by the police to help enforcement of a federal law. But search is a functional, not merely a physical, process. Search is not completed until effective appropriation, as part of an uninterrupted transaction, is made of illicitly obtained objects for subsequent proof of an offense. Greene's selection of the evidence deemed important for use in a

federal prosecution for counterfeiting, as part of the entire transaction in [Lustig's room] was not severable, and therefore was part of the search carried on in that room. The uncontroverted facts show that before the search was concluded Greene was called in, and although he himself did not help to empty the physical containers of the seized articles he did share in the critical examination of the uncovered articles as the physical search proceeded. It surely can make no difference whether a state officer turns up the evidence and hands it over to a federal agent for his critical inspection with the view to its use in a federal prosecution, or the federal agent himself takes the articles out of a bag. It would trivialize law to base legal significance on such a differentiation. Had Greene accompanied the city police to the hotel, his participation could not be open to question even though the door of [Lustig's room] had not been opened by him. [Citation omitted.] To differentiate between participation from the beginning of an illegal search and joining it before it had run its course, would be to draw too fine a line in the application of the prohibition of the Fourth Amendment as interpreted in Byars v. United States [citation omitted].

The crux of that doctrine is that a search is a search by a federal official if he had a hand in it; it is not a search by a federal official if evidence secured by state authorities is turned over to the federal authorities on a silver platter. The decisive factor in determining the applicability of the Byars case is the actuality of a share by a federal official in the total enterprise of securing and selecting evidence by other than sanctioned means. It is immaterial whether a federal agent originated the idea or joined in it while the search was in progress. So long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it. Where there is participation on the part of federal officers it is not necessary to consider what would be the result if the search had been conducted entirely by State officers. Evidence secured through such federal participation is inadmissible . . . .

. . . The fact that state officers preceded [Greene] in breach of the rights of privacy does not negative the legal significance of this collaboration in the illegal enterprise before it had run its course.

338 U.S. at 78-79.

The "silver platter" doctrine mentioned in *Lustig* was rejected in *Elkins v. United States*, 364 U.S. 206, 223, 80 S. Ct. 1437, 4 L. Ed. 2d 1669 (1960), when the U.S. Supreme Court stated: "[W]e hold that evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial."

While *Byars* and *Lustig* pertained to interaction by governmental agencies, one state and the other federal, a question arises concerning a search in which a private person and a government official have combined parts. Government involvement or participation in a search with a private person is not always in the form of an officer's imperative direction to the private individual: "Make the search." There are more subtle and less obvious forms of governmental involvement, but governmental involvement nonetheless.

Although the "silver platter" doctrine regarding joint endeavors between state and federal officials has been rejected, the concept may still apply to searches by private parties. Nevertheless, courts which have considered combined efforts of a government official and a private person in a search hold that a search is subject to the fourth amendment prohibition against an unreasonable search if the search is a joint endeavor involving a private person and a government official. See, *Corngold v. United States*, 367 F.2d 1 (9th Cir. 1966) (search by an airline employee and customs agents held to be a joint search where the customs agents "joined actively in the search"); *State v. Cox*, 100 N.M. 667, 674 P.2d 1127 (1983) (search by police officer, fire chief, and private insurance arson investigator held to be a joint search where the officers participated with private persons in a continuing arson investigation); *State v. Scrotsky*, 39 N.J. 410, 189 A.2d 23 (1963) (entry by police officers and a

landlady without the right of entry; search held to be "concert of action" even though landlady effected the actual identification and seizure of evidence).

Referring to a joint endeavor between a private person and a government official, LaFave notes:

> It is not essential that the government official be involved in the endeavor at the very outset; cases in this area often apply the rule from *Lustig v. United States* [338 U.S. 74, 69 S. Ct. 1372, 93 L. Ed. 1819 (1949)] that it is "immaterial" whether the government official "originated the idea or joined in it while the search was in progress" and that it is sufficient that the official "was in it before the object of the search was completely accomplished." Nor is it necessary that the government official directly participate in the illegal entry. The courts have found sufficient government involvement where the officer was standing by giving tacit approval to the entry made by a private person.

1 W. LaFave, Search & Seizure, a Treatise on the Fourth Amendment § 1.8(b) at 179-80 (2d ed. 1987).

We hold, therefore, that a private person's status as a state or government agent in a search is not restricted to a search ordered, requested, or initiated by the state or government official but may include a search which is a joint endeavor between a private person and a state or government official. We further hold that a search is subject to the constitutional safeguard against an unreasonable search, prohibited by the fourth amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution, if the search is a joint endeavor involving a private person and a state or government official.

In Abdouch's case, the Clark family, accompanied by members of the Douglas County Sheriff's Department, went to Abdouch's residence. The Clark family, obviously lacking authority to enter on the farmstead, would not have ventured to the Abdouch residence without the officers. None of the group had legal authority to take possession of any property which belonged to Terry Clark and which might be found on the premises. Although the Nebraska Probate Code specifically furnishes procedures to obtain possession of a decedent's

personal property, none availed herself or himself of those probate procedures. Concerning the Abdouch residence, none of the group, comprised of the Clark family and the officers, had a claim to enter, or a legal status, greater or stronger than a stranger's.

When the group encountered the babysitter, Sergeant Larson stated the objective of the group, namely, to retrieve personal property belonging to Terry Clark. Entry into the house was gained under auspices of the officers, who accompanied the Clark family during their incipient search of the dwelling. Thus, the officers placed the Clark family in a position to search the Abdouch residence—an official involvement which cannot be reasonably characterized as passive. What apparently and initially germinated as an ersatz probate distribution of Terry Clark's personal property burgeoned into a general search for any property, which might have belonged to Terry Clark, and later blossomed into a full-scale search by officers of the sheriff's department. While the State argues that the search of Abdouch's residence should be divided into two separate searches—one by the Clark family and the other by the officers—such bisection is as impossible as it is illogical. By the officers' approval and participation in the Clark family extra-probate scheme, a plan which could not have been executed without the officers' involvement, the search of Abdouch's residence was saturated with the color of· governmental authority. To dissect the search as suggested by the State would effectively eviscerate constitutional protection from every joint search by officers and private citizens. When the rationale of *Lustig* is applied to the farmstead search in Abdouch's case, the joint search or search by joint endeavor was a single search conducted by both private citizens, who had entered the premises with police assistance and approval, and officers, who, in effect, provided the "key" to enter the premises through a display of government authority. The actions of the Clark family and the officers are too interdependently connected and inseparable to allow isolation of the Clark family's activity from the officers' participation in the search. As the result of the joint endeavor of the Clark family and the officers, "the effect is the same as though [the

officers] had engaged in the undertaking as one exclusively" their own. *Byars v. United States*, 273 U.S. 28, 33, 47 S. Ct. 248, 71 L. Ed. 520 (1927).

Without conceptual dissection of the search into degrees of responsibility and participation, suffice it to say that the search would not have occurred without the officers' presence and involvement, which, under the circumstances, constituted a search as a joint endeavor of private persons and the State's officers. Thus, all evidence obtained at the farmstead, which was Abdouch's residence, was the result of governmental involvement in a search contrary to the constitutional safeguard against an unreasonable search. For that reason, the district court should have sustained Abdouch's suppression motion regarding the physical evidence obtained during the search of the farmstead and should have excluded those illegally obtained items as evidence against Abdouch. The district court's findings concerning Abdouch's suppression motion are clearly erroneous and resulted in error prejudicial to Abdouch, when the court overruled the suppression motion. The district court's reception of the constitutionally inadmissible physical evidence obtained through the illegal search of the farmstead was an abuse of discretion.

## "FRUIT OF THE POISONOUS TREE"

Abdouch also contends that her custodial statements to Officer Jackson should have been suppressed because her statements were the product of an illegal search or, as condemned by *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963), were the "fruit of the poisonous tree." In *Wong Sun*, the U.S. Supreme Court required exclusion not only of evidence directly produced by a constitutionally invalid search but also evidence indirectly derived from the unconstitutional search. Reference to "fruit of the poisonous tree" in *Wong Sun* is a condemnation of the government's subsequent exploitation of a prior violation of a defendant's constitutional right. As expressed in *Wong Sun*, whether evidence is the derivative product of a constitutionally invalid search turns on the question " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of

that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " 371 U.S. at 488. (Quoting from J. Maguire, Evidence of Guilt (1959).)

The U.S. Supreme Court, in *Brown v. Illinois*, 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975), considered a statement which satisfied the voluntariness requirement of the fifth amendment, notwithstanding an illegal arrest, and stated:

> In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be "sufficiently an act of free will to purge the primary taint." 371 U.S. at 486. *Wong Sun* thus mandates consideration of a statement's admissibility in light of the distinct policies and interests of the Fourth Amendment.

> If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. See *Davis v. Mississippi*, 394 U. S. 721, 726-727 (1969). Arrests made without warrant or without probable cause, for questioning or "investigation," would be encouraged by the knowledge that evidence derived therefrom could well be made admissible at trial by the simple expedient of giving *Miranda* warnings. Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a "cure-all," and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to "a form of words." See *Mapp v. Ohio* [citation omitted].

422 U.S. at 602-03.

Evaluating the effect of the *Miranda* warning in the related context of a fourth amendment violation concerning an arrest, the Supreme Court continued in *Brown v. Illinois, supra*:

> [T]he *Miranda* warnings, *alone* and *per se*, cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession. They cannot

assure in every case that the Fourth Amendment violation has not been unduly exploited. [Citation omitted.]

. . . The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances . . . and, particularly, the purpose and flagrancy of the official misconduct are all relevant. . . . The voluntariness of the statement is a threshold requirement.

(Emphasis in original.) 422 U.S. at 603-04. See, also, *Oregon v. Elstad*, 470 U.S. 298, 306, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985): "The *Wong Sun* doctrine ['fruit of the poisonous tree'] applies as well when the fruit of the Fourth Amendment violation is a confession."

This court has adopted the five-factor test enunciated in *Brown v. Illinois, supra*, to determine whether a defendant's statement, obtained after an illegal arrest, must be excluded under the fourth amendment. See *State v. Smith*, 209 Neb. 505, 308 N.W.2d 820 (1981).

In considering a custodial statement relative to the different settings involved in an illegal arrest and an illegal search, LaFave points out:

In the typical case in which the defendant was present when incriminating evidence was found in an illegal search or in which the defendant was confronted by the police with evidence they had illegally seized, it is apparent that there has been an "exploitation of that illegality" when the police subsequently question the defendant about that evidence or the crime to which it relates. This is because "the realization that the 'cat is out of the bag' plays a significant role in encouraging the suspect to speak."

Because this is the case, the more fine-tuned assessment which the Supreme Court mandated in *Brown v. Illinois* for determination of when a confession is the fruit of an illegal *arrest*, is ordinarily unnecessary when the "poisonous tree" is instead an illegal search. As explained in *People v. Robbins* [54 Ill. App. 3d 298, 369 N.E.2d 577

(1977)], the two situations are quite different: "Confronting a suspect with illegally seized evidence tends to induce a confession by demonstrating the futility of remaining silent. On the other hand, the custodial environment resulting from a false arrest is merely one factor to be considered in determining whether a confession is inadmissible." Thus, though the government in *Robbins* argued that the taint was dissipated because two of the factors enumerated in *Brown* (the giving of the *Miranda* warnings, and the absence of a flagrant Fourth Amendment violation) were present, the court quite properly concluded that the confession must be suppressed nonetheless. The defendant had confessed after being confronted with the marijuana illegally seized from his room, and thus it was obvious that he "confessed only because he had already been caught 'red-handed.' " (Similarly, the *Brown* "temporal proximity" factor is of virtually no significance in the present context.)

. . . [I]t is crystal clear that giving the defendant the *Miranda* warnings will not break the causal chain between an illegal search and a subsequent confession. The Court in *Brown* found the warnings alone insufficient when the primary illegality was an illegal arrest, and the warnings have even less of an impact when the prior Fourth Amendment violation was a fruitful illegal search.

4 W. LaFave, Search & Seizure, a Treatise on the Fourth Amendment § 11.4(c) at 403-05 (2d ed. 1987).

As stated in *People v. Johnson*, 70 Cal. 2d 541, 450 P.2d 865, 75 Cal. Rptr. 401 (1969):

There is little, if any reason, to assume that the *Miranda* warning neutralizes the inducement to confess furnished by the confrontation of the defendant with the illegally obtained evidence which shows his guilt and the futility of remaining silent. If *Miranda* warnings were held to insulate from the exclusionary rule confessions induced by unlawfully obtained evidence, the police would be encouraged to make illegal searches in the hope of obtaining confessions after *Miranda* warnings even though the actual evidence seized might later be found

inadmissible. . . . To so hold would result in the *Miranda* warning—intended to protect the defendant's rights to counsel and to remain silent . . . and to prevent exploitive police practice . . . —becoming the instrument of a bootstrap operation to insulate unlawful police activities from the effects of the exclusionary rule.

. . . We recognize, of course, that *Miranda* did not purport to eliminate the use of confessions "given freely and voluntarily without any compelling influences." [Quoting from *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).] We recognize, too, that the taint of illegal action in this context can be dissipated by an intervening act of defendant's free will [citation omitted], and that the *Miranda* warning may be a factor to be considered with other evidence indicating that the defendant has acted independently of the unlawful inducement. However, the shield of *Miranda* should not become a sword to vitiate the keystone of the rule excluding illegally obtained evidence, namely, that "the prosecutor may not profit directly or indirectly from an illegal search." [Citations omitted.] Accordingly, although the *Miranda* warning may be a factor in determining whether there is an intervening act of free will, it does not in isolation demonstrate the requisite attenuation.

70 Cal. 2d at 550-51, 450 P. 2d at 871, 75 Cal. Rptr. at 407.

In *Rogers v. Superior Court*, 46 Cal.2d 3, 10 [291 P.2d 929], we found a basic distinction between evidence seized in violation of search and seizure provisions and voluntary statements made during an illegal detention. "The voluntary admission is not a necessary product of the illegal detention; the evidence obtained by an illegal search or by a coerced confession is the necessary product of the search or of the coercion."

The distinction in *Rogers* is similarly applicable to the effect of a *Miranda* warning on a confession obtained by confrontation with evidence secured by an unlawful search, and a confession following an illegal arrest. Cases where a confession follows an unlawful arrest, and those where the confession follows a confrontation of the

defendant with illegally seized evidence are distinguishable. In the latter case, the illegality induces the confession by showing the suspect the futility of remaining silent. [Citation omitted.] Where . . . a confession follows a false arrest, the custodial environment is merely one factor (though a significant one) to be considered in determining whether the confession is inadmissible.

70 Cal. 2d at 551-52, 450 P.2d at 871-72, 75 Cal. Rptr. at 407-08.

We agree with the conclusion expressed in *People v. Johnson, supra,* that is, the *Miranda* warning, by itself, does not preclude exclusion of a defendant's custodial statement induced by confrontation with evidence obtained through a constitutionally invalid search because the *Miranda* warning does not break the cause-and-effect relationship between an illegal search and a defendant's subsequent incriminating statement, confession, or admission. See, also, *State v. Blair,* 691 S.W.2d 259 (Mo. 1985) (confession on confrontation with palm print, taken after illegal arrest, matched with that at murder scene); *State v. Jennings,* 461 A.2d 361 (R.I. 1983) (confrontation with fact that police found the murder weapon during an illegal search of defendant's apartment); *Hart v. Commonwealth,* 221 Va. 283, 269 S.E.2d 806 (1980) (defendant confronted with lab results on illegal search of his clothing for glass particles; confession was exploitation of search); *People v. Hines,* 195 Colo. 71, 575 P.2d 414 (1978) (statements after marijuana found in backpack properly excluded although *Miranda* warning was given); *State v. Williams,* 162 W. Va. 309, 249 S.E.2d 758 (1978) (confession after confrontation with illegally seized evidence regarding a murder charge could not be used despite the *Miranda* warning); *Com. v. Johnson,* 474 Pa. 512, 379 A.2d 72 (1977) (confession relative to murder after police illegally found bloodied sheets and victim's clothing in defendant's house); *Fuller v. State,* 246 Ark. 138, 437 S.W.2d 780 (1969) (statements regarding stolen property inadmissible as fruit of illegal search).

Jackson's presence at the corrections office was directly connected with the search in question and was an avowed interrogation concerning "all the evidence" obtained at Abdouch's residence. Although the *Miranda* warning was given

to Abdouch before her statements and there is no indication that her statements were other than voluntary, Jackson prefaced the interrogation by reference to all items obtained as the result of the constitutionally invalid search. Confronted with an item-by-item description and verbal inventory of the illegally seized evidence, Abdouch undoubtedly recognized the futility of remaining silent and admitted her participation in production of the contraband marijuana. Therefore, we conclude that Abdouch's custodial statements were obtained as an exploitation of the constitutionally invalid search and seizure of evidence at Abdouch's residence and, as such, were the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). The district court's findings concerning Abdouch's suppression motion are clearly erroneous and resulted in error prejudicial to Abdouch, when the court overruled the suppression motion concerning Abdouch's custodial statements. The district court's reception of the constitutionally inadmissible statements obtained as the result of the illegal search of the farmstead was an abuse of discretion.

Because constitutionally inadmissible evidence was introduced over Abdouch's objection in the trial and resulted in Abdouch's conviction, we reverse the judgment entered on Abdouch's conviction and remand this matter for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.