STATE OF NEBRASKA, APPELLANT, V. SHAWN J. STATEN, APPELLEE.
448 N.W.2d 152

Filed November 17, 1989.   No. 89-691.

Ronald L. Staskiewicz, Douglas County Attorney, and Robert C. Sigler for appellant.

Thomas M. Kenney, Douglas County Public Defender, and Brian S. Munnelly for appellee.

SHANAHAN, J.

In its information, the State charged Shawn J. Staten with unlawful possession with intent to distribute a controlled substance (cocaine). See Neb. Rev. Stat. § 28-416(1)(a) (Cum. Supp. 1988). Staten filed a motion to suppress the physical evidence (cocaine), see Neb. Rev. Stat. § 29-822 (Reissue 1985), and her custodial statements, see Neb. Rev. Stat. § 29-115 (Reissue 1985). Because the district court for Douglas County sustained Staten's suppression motions, the State appeals and seeks review by a judge of this court, pursuant to Neb. Rev. Stat. §§ 29-824 and 29-116 (Reissue 1985).

On the morning of March 29, 1989, in the Kansas City International Airport, Agent Carl Hicks of the Federal Drug Enforcement Agency was routinely observing arrival of flights from Los Angeles, California, and noticed a man and a woman, later identified as Tracy Wood and Staten, whom he described as "suspicious" inasmuch as the couple fit the drug courier profile. When Hicks approached the pair and asked

them for identification, Wood and Staten said they had none. However, Staten later produced some identification and also displayed their plane tickets. Hicks noted that Wood and Staten had paid cash for their plane tickets and that they were flying to Omaha on Braniff Airline flight 1490, which was scheduled to arrive in Omaha at 8:30 that morning. Since no drug detection dog was available at Kansas City and because the couple's luggage was already on board the Omaha flight scheduled for departure in the next few minutes, Hicks terminated the interview with Wood and Staten, who boarded Braniff flight 1490 to Omaha.

Hicks telephoned Sgt. James Cisar of the Omaha Police Division and related Hicks' observations at the Kansas City International Airport. Cisar immediately called Sgt. William Agnew of the Omaha Police Division's narcotics unit. Agnew assembled a team of FBI agents and Omaha police officers, who went to Eppley Airfield to meet Braniff flight 1490. Agnew also contacted Steve Sanchelli, an Omaha police officer who handles "Bush," a dog used for drug detection by the Omaha Police Division, and asked Sanchelli to bring Bush to the airport. On arrival at the airport, the officers and the FBI agents went to gate 21, where flight 1490 was to arrive, and set up surveillance. When flight 1490 arrived at 8:30 a.m., the officers observed Wood and Staten disembark from the plane and walk to the baggage claim area. Staten made a phone call, after which she and Wood retrieved three pieces of luggage and began to walk toward the airport's main terminal area. Agnew approached Wood and Staten, identified himself as a police officer conducting a "narcotics investigation," and asked them to produce their plane tickets. Staten said she had discarded her ticket on the plane. When Agnew asked for some identification, Staten showed Agnew a copy of a birth certificate and her Social Security card. Agnew told Wood and Staten that a drug detection dog was en route to the airport and asked whether they would consent to having the dog "sniff" their luggage for the possible presence of controlled substances. Staten agreed to let the dog sniff her luggage.

Wood and Staten accompanied the officers to the airport security area, where Agnew asked Staten about the reason for

her presence in Omaha. Staten responded that she was visiting her brother, Harry Harris. Agnew knew that Harry Harris, an alias for Dan Staten, was in custody. Harris was a member of a Los Angeles gang and was "involved in narcotics activity" in Omaha. Also, Agnew had personally arrested Staten's sister, Mowesha Staten, in an Omaha motel for possession of a controlled substance.

Approximately 15 minutes after Staten had arrived in Omaha, Officer Sanchelli arrived at the airport with Bush, the drug detection dog. Bush had been specially trained in locating cocaine, heroin, and other controlled substances and was used to "alert" officers to the presence of a controlled substance within luggage. The "alert" consists of Bush's sniffing luggage and then biting or scratching luggage which contains a controlled substance. Bush had positively verified controlled substances in luggage on 18 occasions before Staten encountered the officers at the Omaha airport. Luggage with Staten's name was placed in the airport hallway for Bush's "off-leash" sniffing. Bush sniffed three pieces of luggage and "alerted" to one piece of luggage, indicating that there was a controlled substance in the baggage item in Staten's name. Staten told Agnew that he could search her luggage but not search her. As far as the record discloses, there was no female officer at the airport to conduct a search of Staten's person. According to Agnew: "At that point I informed [Staten] that she was under arrest for suspicion of possession of a controlled substance and she would be taken to central police headquarters and we were going to apply for a search warrant for her luggage and her person." No one questions that Staten was arrested for possession of a controlled substance at the airport. The officers then transported Staten to police headquarters.

At police headquarters, Staten was taken to an interview room where, shortly after 10 a.m., Officer James Haiar presented her with a *Miranda* "rights advisory form." Although Staten refused to make a statement, a few minutes later she indicated to officers that she would be willing to make a statement. Meanwhile, Agnew prepared an application for a search warrant. The county court for Douglas County issued a

search warrant at 1:25 p.m. In the presence of a female police officer, the warrant, which authorized a search of Staten's person and her luggage, was immediately served on Staten. After Staten had read the warrant, which she understood, she removed a plastic bag, containing 6 ounces of cocaine, from her bra. The police presented a second "advisory form" regarding the *Miranda* admonition. Staten indicated that she understood her rights, made statements to the police, and was booked for possession of a controlled substance (cocaine).

Staten filed a motion to suppress the cocaine, claiming that the evidence was obtained through an unreasonable search of her person. See, Neb. *Const.* art. I, § 7; U.S. *Const.* amend. IV. In a companion motion, Staten requested suppression of her custodial statements to the police, contending that her statements were the product of an illegal search and unlawful arrest.

In granting the suppression motions, the district court concluded:

> When the dog alerted to the defendant's luggage the officer had sufficient facts to show the county judge probable cause for the issuance of a search warrant to search the luggage. There was as yet no probable cause to include the person of the defendant in the affidavit for the search warrant nor the search warrant itself. The warrant was overreaching in its scope and unreasonably subjected the defendant to a potential strip search based primarily on the trained dog's alert to her luggage. If upon a search of the luggage contraband had been found, the defendant would be subject to immediate arrest and search incident to the arrest. The arrest of the defendant after the dog alerted to the luggage was an unlawful arrest. The execution of the search warrant upon the person of the defendant several hours later was without probable cause that a crime had been committed by her and all fruits of the search of the defendant must be excluded from her trial in this case.

> Similarily [sic], any statements given by the defendant were a product of the unlawful arrest and improper search and the statement is likewise excluded from use by the

State against the defendant at the trial herein.

The State contends that the police had probable cause to arrest Staten, that the search warrant for Staten's luggage and her person was valid, that the search was reasonable and not in violation of Staten's constitutional rights, and that Staten's statements to police were not the product of a constitutionally invalid search.

## STANDARD OF REVIEW

The issue is whether the contraband and statements were obtained in violation of the protection afforded by the state and federal Constitutions against an unreasonable search and seizure.

"In determining the correctness of a trial court's ruling on a motion to suppress, the Supreme Court will uphold the trial court's findings of fact unless those findings are clearly erroneous." *State v. Copple*, 224 Neb. 672, 689, 401 N.W.2d 141, 154 (1987).

"In determining whether a trial court's findings on a motion to suppress are clearly erroneous, the Supreme Court recognizes the trial court as the 'trier of fact' and takes into consideration that the trial court has observed witnesses testifying regarding such motion to suppress." *State v. Dixon*, 222 Neb. 787, 795, 387 N.W.2d 682, 687 (1986).

## PROBABLE CAUSE TO ARREST

The State contends that because the police believed that Staten had controlled substances in her luggage as a result of Bush's "alert" to the luggage, probable cause existed for Staten's arrest. The question is, therefore, whether a drug detection dog's "alert" to luggage, indicating the presence of a controlled substance, constitutes probable cause to arrest.

Under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), police can stop and briefly detain a person for investigative purposes if the police have a reasonable suspicion, supported by articulable facts, that criminal activity exists, even if probable cause is lacking under the fourth amendment. See, also, *State v. Thomte*, 226 Neb. 659, 413 N.W.2d 916 (1987). Reasonable suspicion entails some minimal level of objective justification for the detention, something more than

an inchoate and unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause. *United States v. Sokolow*, ____ U.S. ____, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989).

The U.S. Supreme Court has held that persons whose appearance and activities fit the so-called drug courier profile may be briefly detained by law enforcement officers under *Terry v. Ohio*. See, *United States v. Place*, 462 U.S. 696, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983); *Florida v. Royer*, 460 U.S. 491, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *United States v. Sokolow, supra*. The drug courier profile is a compilation of characteristics found to be typical for persons transporting illegal drugs, such as trips to and from cities which are major sources of drugs, with short stays in the cities; cash payment for tickets; use of aliases; unchecked luggage and little or no identification on luggage; attire; and nervousness. See *United States v. Sokolow, supra*. Neither the State nor Staten disputes the district court's finding that police did not violate Staten's constitutional rights in detaining her at the airport.

In *Florida v. Royer, supra*, the U.S. Supreme Court held that police had no probable cause to arrest the defendant based upon the facts that he was traveling from Miami to New York City under an assumed name; that he was carrying two suitcases that appeared to be heavy; that he was young, was casually dressed, and appeared to be pale and nervous; and that he had paid for his ticket in cash with a large number of bills. The fact that defendant fit the so-called drug courier profile constituted adequate grounds for suspecting the defendant of carrying drugs and justified an investigatory stop by police officers. *Id*. However, when the police officers took the defendant to a small room for further interrogation, retrieved his checked luggage from the airline, took his airplane ticket and identification, and never informed defendant that he was free to leave at any time nor that he need not consent to the search of his luggage, the Supreme Court held that the investigatory stop exceeded the constitutional limitation of a *Terry* stop. See *Terry v. Ohio, supra*. The *Royer* Court found that the means employed by the police officers were too intrusive to effectuate an investigative detention and that restraint of the defendant was unjustified,

and then concluded that there were less intrusive means which the officers could have employed:

> The courts are not strangers to the use of trained dogs to detect the presence of controlled substances in luggage. There is no indication here that this means was not feasible and available. If it had been used, Royer and his luggage could have been momentarily detained while this investigative procedure was carried out. Indeed, it may be that no detention at all would have been necessary. A negative result would have freed [the defendant] in short order; *a positive result would have resulted in his justifiable arrest on probable cause.*

(Emphasis supplied.) 460 U.S. at 505-06.

At least three federal appellate courts have held that an "alert" by a trained drug detection dog constitutes probable cause for arrest. See, *U.S. v. Massac*, 867 F.2d 174 (3d Cir. 1989); *United States v. Waltzer*, 682 F.2d 370 (2d Cir. 1982); *United States v. Williams*, 726 F.2d 661 (10th Cir. 1984). Appellate courts in three state jurisdictions have also expressly held the same. See, *State v. Bullock*, 460 So. 2d 517 (Fla. App. 1984); *State v. Foster*, 390 So. 2d 469 (Fla. App. 1980); *People v. Campbell*, 67 Ill. 2d 308, 367 N.E.2d 949 (1977); *Morrow v. State*, 757 S.W.2d 484 (Tex. App. 1988) (even in the absence of consent to search, a drug detection dog's "alert" to the presence of narcotics in defendant's luggage justified the arrest of appellant).

The use of trained dogs to detect the presence of controlled substances in luggage has been held to be a feasible and expeditious way to detain a suspect for the shortest period of time in which to confirm or dispel suspicions. See *Florida v. Royer, supra*. See, also, *United States v. Place, supra* (canine sniff discloses only the presence or absence of narcotics, and such limited disclosure ensures against the embarrassment and inconvenience of the owner that is possible with other, more intrusive means of investigation). This conclusion is based on the fact that dogs trained especially for the purpose of detecting a controlled substance can detect the presence of concealed narcotics with almost unerring accuracy. When Bush "alerted" to Staten's luggage, this fact, combined with the other

circumstances known to the police, supplied probable cause to arrest Staten.

## VALIDITY OF SEARCH WARRANT

In *United States v. Robinson*, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973), the Supreme Court held that if there is a lawful arrest, police have authority, without a search warrant, to conduct a full search of the person arrested and that such search is reasonable under the fourth amendment to the U.S. Constitution. Further, a police officer's search is not limited to searching the arrested person for weapons only; the officer may search for and seize any evidence on the arrestee's person, even if such evidence is unrelated to the crime for which the arrest was made, in order to prevent concealment or destruction of evidence. *Chimel v. California*, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969). A search incident to arrest need not be made immediately on arrest. "[S]earches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." *United States v. Edwards*, 415 U.S. 800, 803, 94 S. Ct. 1234, 39 L. Ed. 2d 771 (1974). See, also, *Abel v. United States*, 362 U.S. 217, 80 S. Ct. 683, 4 L. Ed. 2d 668 (1960). See, further, *State v. Weible*, 211 Neb. 174, 317 N.W.2d 920 (1982) (arresting officers may search person of arrestee to discover and remove weapons and to seize evidence to prevent its concealment or destruction, as well as search the area within the arrestee's immediate control); *State v. McElroy*, 189 Neb. 376, 202 N.W.2d 752 (1972) (arrest of defendant and later search of defendant's person at police station held lawful).

As noted, the district court found that while there was probable cause for the warrant to search Staten's luggage, there was no probable cause for issuance of a warrant to search Staten's *person*. However, as previously indicated, Bush's alert to the luggage constituted sufficient probable cause to arrest Staten. Thus, a warrant was unnecessary for a search of Staten's person because the police were entitled to search Staten as an incident of her lawful arrest.

The search of Staten's person, an incident of her lawful arrest, is not unreasonable and, therefore, does not violate the

constitutional protection against an unreasonable search and seizure. A search warrant was unnecessary. Consequently, whether a warrant authorizing the search of Staten's person is valid need not be reviewed. Cf. *State v. Andersen*, 232 Neb. 187, 440 N.W.2d 203 (1989) (doctrine of "inevitable discovery" in reference to an allegedly unconstitutional search and seizure).

The cocaine, as physical evidence obtained from Staten's person, is constitutionally admissible. Staten's custodial statements are not "fruits of the poisonous tree" and, therefore, are admissible. See *State v. Abdouch*, 230 Neb. 929, 434 N.W.2d 317 (1989).

Under the circumstances, the district court's findings that the physical evidence and statements from Staten were products of an unreasonable search and seizure are clearly erroneous. For that reason, the district court's judgment suppressing the evidence obtained from Staten's person and suppressing her custodial statements is reversed.

REVERSED.