STATE OF NEBRASKA, APPELLEE, V. EVAN C. JOLITZ, APPELLANT.
435 N.W.2d 907

Filed February 17, 1989.   No. 88-372.

Jerry L. Soucie for appellant.

Robert M. Spire, Attorney General, and Kimberly A. Klein for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Following a bench trial, defendant-appellant, Evan C. Jolitz, was adjudged guilty of possessing more than 1 pound of marijuana in violation of Neb. Rev. Stat. § 28-416(5) (Reissue 1985), and was sentenced accordingly. He assigns three errors, which claim the evidence used against him was obtained in violation of the 4th and 14th amendments to the U.S. Constitution and of article I, § 7, of the Nebraska Constitution because the warrants authorizing the search and seizure were based on (1) a prior warrantless and unlawful search and seizure and (2) a false affidavit. We affirm.

The evidence adduced at the hearing on defendant's suppression motion establishes that while off duty, Kevin Stukenholtz, a lieutenant of the Nebraska State Patrol not regularly engaged in narcotics work, gave a hitchhiker, Thomas Mark Hart, three rides in Stukenholtz' personal automobile. Neither man knew the other before these encounters, and the rides occurred while Stukenholtz was on personal trips.

The first episode took place in June 1986, at which time Hart asked Stukenholtz to drive him to Swedeburg. Hart indicated that he hitchhiked all over the country and was coming from Oklahoma. While traveling toward Swedeburg, Hart, unaware that Stukenholtz was with the State Patrol, told Stukenholtz that he was going to visit Jolitz. According to Stukenholtz, Hart said Jolitz grew marijuana and stored it, when harvested, in a freezer or bank vault in an "old bank building" owned by Jolitz and located near his residence. Following Hart's directions, Stukenholtz drove Hart to Jolitz' home in Swedeburg, where he, without seeing anyone else, left Hart off and drove away before Hart entered the house. Stukenholtz then contacted the deputy county attorney about acquiring a search warrant, and also contacted an Investigator Hobbs, whom Stukenholtz knew had investigated the growing and sale of marijuana by Jolitz. Hart, however, claimed he only told Stukenholtz that Jolitz grew marijuana and had some greenhouses, but never mentioned the bank building or that Jolitz stored the marijuana in the basement.

The second encounter occurred in September 1986, at which time Stukenholtz once more drove Hart to Jolitz' residence and

again saw no one else at the premises before he left. On this trip, Hart had asked Stukenholtz to come into the house and smoke some marijuana, which offer Stukenholtz declined. Although Stukenholtz still did not know who the hitchhiker was, he considered anew getting a search warrant, and contacted the deputy county attorney, who said that without corroboration of the hitchhiker's information, there was no basis for obtaining a warrant.

The third incident occurred on May 19, 1987. This time Hart was on his way to Montana when his automobile broke down, so he decided to hitchhike to Jolitz' home. By this time, Stukenholtz recognized the hitchhiker and assumed he was going to Jolitz'. Stukenholtz again did not identify himself as a law enforcement officer and, being interested in getting information to assist in acquiring a search warrant, let Hart generate conversation about Jolitz. Hart indicated he was indeed en route to Jolitz' and discussed "scoring some dope" for Stukenholtz. Stukenholtz indicated to Hart that he was familiar with marijuana and smoked it. They talked about different techniques of growing high-grade marijuana, fertilization, and pollination.

According to Stukenholtz, Hart told Stukenholtz about the marijuana Jolitz produced and

> talked about how good it was, high quality, Evan's ability to grow dynamite pot, as he put it. He talked about Evan's schooling, how informed he was in growing marijuana, how impressed he was with his greenhouse and his operation, and how he and Evan were close friends and that for marijuana work, that Evan always gave him free pot and that when he was out of money, that Evan always took care of him in the way of marijuana.

Stukenholtz planned to drop Hart off at Jolitz' and then proceed to Wahoo, as he had done the past two times. However, when they got to Jolitz', Hart said Jolitz was not home, as Jolitz' automobile was not there and it was a little early for Jolitz to be home from work, and said, "I'll run in and get us some pot, if you can give me a ride to Wahoo." Once again, according to Stukenholtz, Hart said he was going to get the marijuana in the bank building. Stukenholtz parked around a

bend, facing east, away from Jolitz' house. Hart got out, went directly west of the vehicle to the bank building, and disappeared from Stukenholtz' sight, going south down along the east side of the building. Stukenholtz remained in his automobile, where his view of the east side was obscured by a cabin adjacent to the east side of the bank building. Hart entered the bank building through a closed but unlocked window on the east side of the bank, the side next to the cabin, and went to the basement freezer where he knew the marijuana was always kept. He found two big garbage sacks full of marijuana buds, still green and wet, appearing to be recently harvested, in the freezer. He took "a lot" of the marijuana out of one of the garbage bags and put it in another bag, which he took with him.

After about 5 minutes, Stukenholtz, watching in the mirror, saw Hart come out from where he had disappeared and approach the automobile. Hart opened the door of the vehicle, placed a large white plastic garbage bag on the floor, got in, and said, "I got us some good dope." Stukenholtz responded, "[O]h, really? Was there any more in there?" Hart answered, "[Y]es, there's another bag about this size." The marijuana was not packaged, rolled, or processed, and was wet and stripped of branches, although not stemless.

Hart opened the bag, showed it to Stukenholtz, stated "it looked like some good marijuana," and also stated that he was going to give Stukenholtz "some for . . . being such a good guy and giving him a ride." Stukenholtz said "fine," and Hart put about 1 ounce, a handful, of loose marijuana in Stukenholtz' gym bag in the back seat.

They did not discuss how Hart got into the building, but, according to Stukenholtz, he asked Hart what Jolitz' attitude would be about Hart taking that much marijuana. Hart said that "they were friends and partners and that [Jolitz] had owed him some money and that [Jolitz] wouldn't care and that he had on numerous occasions gotten marijuana from [Jolitz]. And if [Jolitz] wasn't home, he just left a note that Sparky was there." Hart, on the other hand, denies making any comment about whether Jolitz was home, and also denies mentioning the bank building or any agreement he may have had with Jolitz, but

does admit some kind of agreement existed whereby Jolitz gave Hart permission to enter the bank building through the window when Hart wanted some marijuana.

Stukenholtz took Hart into Wahoo, let him off at a park, and, planning on arresting Hart once he obtained a warrant, made arrangements to pick Hart up later and give him a ride either back to Jolitz' residence or to Lincoln. Hart remained at the park and smoked some marijuana. Later that day, at about 5 p.m., Stukenholtz returned to the park and arrested Hart for possession of marijuana.

Hart testified he had visited Jolitz about twice a year since 1979. He said they had gone to college together, and characterized their relationship as that of friends. Hart also said that over the years he had done odd jobs for Jolitz in exchange for marijuana and that he was willing to travel that distance for the marijuana because it was free, and it was "real good. He does it very scientifically." Hart also described Jolitz' marijuana-growing operation.

After arresting Hart, Stukenholtz obtained a warrant to search Jolitz' premises. The warrant stated that based on Stukenholtz' affidavit, there was probable cause to believe that "dope, contraband, or drug paraphenalia [sic] and/or marijuana" was concealed on Jolitz' premises, and gave officers the authority to seize any such contraband. In his supporting affidavit, Stukenholtz recited the facts surrounding his three encounters with Hart as detailed above, and stated that he, Stukenholtz, believed the substance Hart acquired was marijuana, that Hart offered him some, and that he arrested Hart. The affidavit also reflects that Stukenholtz confirmed through the Wahoo Police Department that Evan C. Jolitz lived at that address, that "said individual was a pathologist and was at one time a professor at the University of Nebraska or an area college, and that Mr. Jolitz at one time was a professional football player." The warrant was executed at about 8 o'clock the evening of May 19.

After that search, a second warrant was obtained to again search Jolitz' premises in order to seize "[r]ecords, computer disks or any documentation which may suggest or be evidence of a delivery network for marijuana . . . ."

In the affidavit attached to his motion to suppress, Jolitz declares that he owns the property which was searched, that he was not present during the searches, that all buildings were locked or otherwise secured, that he had never given Hart permission or authority to enter his property during his absence, and that the last time he had seen Hart was in the spring of 1986.

In connection with the first issue, Jolitz in essence contends that Stukenholtz participated in Hart's unlawful entry and search of Jolitz' property, that Hart's actions were therefore the State's actions, that the warrants which were later issued were obtained as a result of Hart's initial unlawful entry and search, and that as a consequence, the evidence seized pursuant to the warrants was obtained in violation of the previously mentioned constitutional provisions and must therefore be suppressed.

We most recently considered the circumstances under which a search by a private person becomes the search of the State, and thus subject to the federal and state constitutional protections against unreasonable searches and seizures, in *State v. Abdouch*, 230 Neb. 929, 434 N.W.2d 317 (1989). Therein, in holding that the State had participated in the warrantless search because, absent the presence of deputy sheriffs, the private citizens making the search would not have been on the invaded premises, let alone looking for anything, we wrote:

> [A] private person's status as a state or government agent in a search is not restricted to a search ordered, requested, or initiated by the state or government official but may include a search which is a joint endeavor between a private person and a state or government official. We further hold that a search is subject to the constitutional safeguard against an unreasonable search, prohibited by the fourth amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution, if the search is a joint endeavor involving a private person and a state or government official.

*Id.* at 941, 434 N.W.2d at 325.

In considering the elements of a joint endeavor between a private citizen and a government official, *Abdouch* cited with approval language from 1 W. LaFave, Search & Seizure, a

Treatise on the Fourth Amendment § 1.8(b) (2d ed. 1987), which observes that the official's direct participation is not necessarily required; it may be sufficient that the official was standing by, giving tacit approval to the entry made by the private person. However, the three cases LaFave cites in support of that observation narrow it considerably. In *Com. v. Borecky*, 277 Pa. Super. 244, 419 A.2d 753 (1980), not only did the officer have prior knowledge that the private citizen informer was going to search defendant's premises and thus searched the informer prior to entry, the informer knew of the officer's law enforcement status. In *State v. Becich*, 13 Or. App. 415, 509 P.2d 1232 (1973), after the suspect told the officer the stolen property was at defendant's house, the officer told the suspect he would drive by there and observe the suspect load the property into the suspect's automobile. And in *Moody v. United States*, 163 A.2d 337 (D.C. 1960), the complaining witness told the officer that defendant had stolen items of personalty, including clothes, belonging to the witness, and as a result of the accusation, the officer arrested the defendant and, at the witness' suggestion, went to defendant's apartment with the witness to verify the crime, during which time defendant remained in the custody of another officer. The witness entered the defendant's apartment, gathered up the articles claimed to be his, and handed them to the officer, who remained in the hallway.

The case before us is distinguishable from those cases and from *Abdouch* as well. The record under consideration establishes that Hart's only motivation for entering the bank building was to acquire some marijuana. Although Stukenholtz was admittedly interested in obtaining enough information to support the issuance of a warrant to search Jolitz' premises, Hart did not know that; in fact, he was not aware that Stukenholtz was a law enforcement officer. Stukenholtz did not himself enter the bank building, nor did he direct Hart to enter the building and look for the marijuana. Indeed, at the time of Hart's entry, Stukenholtz was so positioned that he could not see the means by which Hart entered the building; so far as Stukenholtz knew, Hart could have had a key. Stukenholtz merely did as Hart asked and, as he had done on two previous

occasions, drove Hart to Jolitz' residence.

It is well established that in reviewing the trial court's ruling on a motion to suppress evidence, the Supreme Court does not reweigh the evidence or resolve conflicts in the evidence. *State v. Marco*, 230 Neb. 355, 432 N.W.2d 1 (1988). Further, the Supreme Court will uphold the trial court's findings of fact on such a motion unless those findings are clearly wrong. *State v. Barnes*, 230 Neb. 949, 434 N.W.2d 516 (1989); *State v. LaMere*, 230 Neb. 629, 432 N.W.2d 822 (1988).

Under the circumstances, it cannot be said the district court erred in concluding that no joint endeavor existed between Hart and Stukenholtz. Hart, without governmental assistance or intervention, entered and obtained marijuana from Jolitz' premises for a purpose of his own, and was in no sense an instrument of the State. Since Hart's entry and search were not subject to the constitutional limitations on searches and seizures, it follows that his actions did not invalidate the warrants which were subsequently issued. See, also, *State v. Ware*, 219 Neb. 594, 365 N.W.2d 418 (1985); *State v. Gundlach*, 192 Neb. 692, 224 N.W.2d 167 (1974), *cert. denied* 421 U.S. 933, 95 S. Ct. 1663, 44 L. Ed. 2d 92 (1975); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971), *reh'g denied* 404 U.S. 874, 92 S. Ct. 26, 30 L. Ed. 2d 120; *Burdeau v. McDowell*, 256 U.S. 465, 41 S. Ct. 574, 65 L. Ed. 1048 (1921).

In connection with the second issue, Jolitz claims the district court should have excised from Stukenholtz' affidavit information which was "false and made with a reckless disregard for the truth." The first difficulty with this claim is that it is not discussed in his brief; thus, we cannot know what it is that Jolitz claims was false. It is for reasons of that nature that the law and rules of practice provide that this court will not consider assignments of error which are not discussed. *Wells Fargo Ag Credit Corp. v. Batterman*, 229 Neb. 15, 424 N.W.2d 870 (1988); *State v. Bonczynski*, 227 Neb. 203, 416 N.W.2d 508 (1987); Neb. Ct. R. of Prac. 9D(1)d (rev. 1988).

Moreover, if the claim of falsity is understood to relate to the fact that Hart denies telling Stukenholtz where Jolitz kept his marijuana or about any agreement between Hart and Jolitz

permitting Hart to enter the premises and take marijuana, as Stukenholtz asserts in his affidavit, the matter is resolved by the rule that on a motion to suppress evidence, the trial court, as the trier of fact, is the sole judge of the credibility of witnesses and the weight to be given to their testimony and other evidence. *State v. Vann*, 230 Neb. 601, 432 N.W.2d 810 (1988). The trial court was in part likely persuaded by the fact that the record offers no explanation as to how Stukenholtz might otherwise have acquired that information.

As we recently reaffirmed in *State v. Cullen, ante* p. 57, 434 N.W.2d 546 (1989), to invalidate a warrant on the ground the supporting affidavit was false, the defendant bears the burden of showing that the affiant made a deliberate falsehood or acted with reckless disregard for the truth and that the challenged information was material or necessary to a finding of probable cause. Jolitz has simply failed to meet that burden.

In determining probable cause for issuance of a search warrant, the issuing magistrate must make a practical, commonsense decision whether, given the totality of all the circumstances before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *State v. Duff*, 226 Neb. 567, 412 N.W.2d 843 (1987); *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), *reh'g denied* 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453. Only the probability, and not a prima facie showing, of criminal activity is the standard for determining probable cause. *State v. Duff, supra*. Where some of the underlying circumstances are detailed in the affidavit, where reason for crediting the source of the information is given, and where a magistrate has found probable cause, the duty of the reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. *State v. Duff, supra*; *Illinois v. Gates, supra*.

The affidavit includes Hart's statements to Stukenholtz on the three occasions that he picked up Hart; Stukenholtz' recital of the events of May 19, 1987; Stukenholtz' receipt of the marijuana from Hart; a statement that the officer, based on his experience, believed the substance to be marijuana; a statement

that Hart did not have the marijuana when Stukenholtz picked him up and when Hart left the automobile; and the corroborating information that Stukenholtz was able to obtain from the Wahoo Police Department. This information together provides a substantial basis for concluding that probable cause existed to issue a warrant or that a fair probability existed that contraband or evidence of a crime would be found on Jolitz' premises.

Accordingly, the warrants were issued properly; the judgment of the district court is correct, and it is hereby affirmed.

AFFIRMED.