STATE OF NEBRASKA, APPELLEE, V. PATRICK A. SARDESON,
APPELLANT.
437 N.W.2d 473

Filed March 24, 1989.   Nos. 88-382, 88-383.

588

Roger C. Lott for appellant.

Robert M. Spire, Attorney General, and Susan M. Ugai for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Following a consolidated jury trial, defendant-appellant, Patrick A. Sardeson, was convicted, in case No. 88-382, of burglary in violation of Neb. Rev. Stat. § 28-507(1) (Reissue 1985), and, in case No. 88-383, of possessing the property stolen during the aforesaid burglary in violation of Neb. Rev. Stat. § 28-517 (Reissue 1985). Having thereafter been found to be a habitual criminal, Sardeson was sentenced to imprisonment for a period of not less than 10 nor more than 20 years on each conviction, the sentences to be served concurrently, with credit for the 375 days Sardeson was incarcerated pending trial of these cases. In this consolidated appeal, Sardeson assigns errors which meld to claim the district court wrongly (1) failed to dismiss the two informations because of excessive delay, (2) failed to require the State to dismiss one charge or the other, (3) failed to suppress certain evidence, (4) excluded certain other evidence, (5) admitted certain evidence, (6) failed to grant a mistrial, and (7) found Sardeson to be a habitual criminal. We affirm.

I. BACKGROUND

On the morning of March 9, 1987, David and Paula Hubertus left their Lancaster County residence for work. Mr. Hubertus returned at 5:30 that afternoon to find that someone had entered the house by breaking open a locked door, had ransacked the house, and had taken several items. The missing items included a videocassette recorder, several rings including

Mrs. Hubertus' very distinctive $2,250 wedding ring, a bracelet, and a metal box containing Mr. Hubertus' coin and currency collection.

Following the investigations detailed below, searches made pursuant to warrant resulted in recovery of the coinbox taken in the Hubertus burglary, which proved to bear Sardeson's fingerprints. Additional facts of record will be discussed as necessary in part II, which analyzes in turn each of Sardeson's summarized assignments of error.

## II. ANALYSIS

### 1. Delay Claim

Sardeson cites as his first assignment of error the district court's refusal to dismiss both informations for excessive delay. Sardeson was arrested on March 12, 1987; bail was set and subsequently reduced, but Sardeson nevertheless remained incarcerated thereafter. He was initially charged with forgery; the charge of burglary was brought on June 19, 1987. On September 23, 1987, the State dismissed the forgery charges; possession of stolen property was charged on October 9, 1987. On November 23, 1987, Sardeson, through his attorney, expressly waived his right to a speedy trial in both cases and requested continuance of both to the January 18, 1988, jury term. The district court accepted this waiver, granted the requested continuance, and ordered the two cases consolidated for trial. Sardeson at no time thereafter questioned the validity of this waiver nor sought to withdraw it but, on December 21, 1987, filed motions to dismiss both cases, arguing, in relevant part, that the State, by actively trying to keep him in custody, violated his rights to a speedy trial and reasonable bail guaranteed him by the sixth and eighth amendments to the U.S. Constitution and article I, §§ 9 and 11, of the Nebraska Constitution. Sardeson now characterizes his earlier abandonment of a timely disposition of the charges against him as a waiver only of his statutory right to a speedy trial, preserving his rights pursuant to constitutional guarantees.

This State's statutory speedy trial guarantee is found at Neb. Rev. Stat. §§ 29-1207 to 29-1209 (Reissue 1985). Section 29-1207 provides in relevant part: "(1) Every person indicted or informed against for any offense shall be brought to trial within

six months, and such time shall be computed as provided in this section. (2) Such six-month period shall commence to run from the date the indictment is returned or the information filed."

This court has noted that

"[t]he constitutional right to a speedy trial and the statutory implementation of that right under section 29-1207, R.R.S. 1943 . . . exist independently of each other. . . . Any unreasonable delay occurring *prior* to the filing of an information will be considered . . . in determining whether or not a defendant has been denied the *constitutional* right to a speedy trial."

(Emphasis supplied.) *State v. Gingrich*, 211 Neb. 786, 789, 320 N.W.2d 445, 447 (1982) (quoting *State v. Costello*, 199 Neb. 43, 256 N.W.2d 97 (1977)). See, also, *State v. Lafler*, 225 Neb. 362, 405 N.W.2d 576 (1987). Clearly, the theoretical distinction between statutory and constitutional rights to speedy trial is fully supported in this state's case law. It therefore seems theoretically possible for a criminal defendant to waive statutory speedy trial rights while preserving rights under constitutional speedy trial guarantees.

Assuming for the purposes of analysis, but not deciding, that Sardeson's unlimited waiver of a speedy trial somehow nonetheless preserved his constitutional guarantees, the question becomes whether the time elapsing between Sardeson's arrest and filing of the informations, a period of just over 3 months in the burglary case and just under 7 months in the possessing stolen property case, impermissibly infringed upon Sardeson's constitutional rights to a speedy trial.

The cases before us grew out of investigative efforts following the burglary of the Hubertus home on March 9, 1987. Pursuant to warrant, searches were conducted in Eagle and Lincoln on March 12, 1987, and Sardeson was arrested later that same day. Lincoln Police Sgt. Charles Hennessey testified that "[t]here was a lot of follow-up work that was done afterwards," although in his estimation the investigation "was probably pretty well wrapped up at the end of the month." As Sardeson's attorney noted in arguing another matter to the trial court, "the police were investigating a number of crimes that don't have anything to do with the two Informations that we're

dealing with. There were a couple of other burglaries, there was a robbery and some other things that were being investigated, forgeries . . . ." The records in the two cases now under consideration establish that police investigations subsequent to Sardeson's arrest included attempts, ultimately successful, to locate stolen property in the hands of an innocent purchaser, and to locate the vehicle used in the burglary, which had been traded shortly thereafter to a used car dealer.

Sardeson complains that his pretrial incarceration interfered with his ability to assist in the preparation of his defense by preventing him from locating potential alibi witnesses. At the hearing on his pretrial motion to dismiss, Sardeson testified:

I was hired at Snyder's Industries and was supposed to start on the 12th, and I couldn't get no witnesses together for that to prove that I was hired there.

Q. All right. When were you at Snyder Industries? What date?

[Sardeson] On the 9th.

Q. Of March?

[Sardeson] Yes.

Q. Of 1987?

[Sardeson] Yes.

Q. And do you know who you talked to there?

[Sardeson] I talked to two people. One was — I guess he's the guy that hires, and then one was a foreman that showed me around.

Q. But you don't know what their names were?

[Sardeson] It's been a while. I don't remember what —

Q. All right. Had you been on bail, could you have gone out there?

[Sardeson] Yes.

Q. Were you anywhere else on March 9th?

[Sardeson] Yes. I was at Welfare. I was receiving food stamps because I was not working at the time, and then I had to — in order to receive food stamps, you have to report to a job service downstairs, which you look through a viewer and they schedule you to, you know, go for a job interview.

Q. Did you see people there at the Department of Social

Services or Welfare?

[Sardeson] Yes, I did.

Q. And do you know what their names were?

[Sardeson] No, I don't.

Sardeson subpoenaed Paul Kearney, operations administrator and custodian of records with the Department of Social Services, who testified that records indicated that someone named Pat Sardeson had visited that office sometime on March 9, 1987.

As this court noted in *State v. Brown*, 214 Neb. 665, 670-71, 335 N.W.2d 542, 546 (1983), concerning constitutional guarantees of the right to a speedy trial,

> [*Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972)] recites a "balancing test" which requires courts to approach each case on an ad hoc basis. This "balancing test" involves four factors bearing upon questions of speedy trial, namely, "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." . . . As further stated in *Barker* . . . "We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process."

(Citations omitted.) See, also, *State v. Gingrich*, 211 Neb. 786, 320 N.W.2d 445 (1982).

Under the provisions of the U.S. and Nebraska Constitutions, the right to a speedy trial is relative and depends upon circumstances; it is not denied where the delay is satisfactorily explained by the government and the defendant was brought to trial as soon as was reasonably possible. *State v. McNitt*, 216 Neb. 837, 346 N.W.2d 259 (1984) (construing U.S. Const. amend. VI and Neb. Const. art. I, § 13). Moreover, even "unexplained delay between arrest and arraignment or preliminary hearing does not demonstrate a violation of the right of speedy trial in the absence of prejudice." *SapaNajin v.*

*Johnson,* 219 Neb. 40, 41-42, 360 N.W.2d 500, 501 (1985), citing *State v. Ellis,* 184 Neb. 523, 169 N.W.2d 267 (1969), which, predating this State's speedy trial statute, considered the question solely in the context of constitutional guarantees.

In the cases now before us, the delays complained of were neither excessive under the circumstances, unexplained, nor prejudicial. The record establishes that at least two police agencies were involved in investigating many crimes other than those charged in these cases. Given the complexity of these investigations, exploring as they did apparent forgery, burglary, and weapons crimes, the duration of the delay which resulted is clearly not so great as to constitute an infringement of Sardeson's constitutional right to a speedy trial.

Moreover, the delay complained of clearly did not prejudice Sardeson in the preparation of his case. Sardeson identified the two persons he wished to contact at his prospective employer's with sufficient particularity that it would have been a simple matter to locate and interview them. Similarly, having subpoenaed the Department of Social Services records officer, it would have been a simple matter to research the records within that officer's control to discover precisely to whom Sardeson had spoken, or at least likely had spoken to, and to conduct appropriate discovery regarding the time of Sardeson's visit.

Absent any showing that preindictment delay caused substantial prejudice to Sardeson's right to a fair trial or that it was an intentional device to gain a tactical advantage over him, the delay did not violate Sardeson's fifth or sixth amendment rights. *United States v. Hardrich,* 707 F.2d 992 (8th Cir. 1983), *cert. denied* 464 U.S. 991, 104 S. Ct. 481, 78 L. Ed. 2d 679. Sardeson's first assignment of error thus is without merit.

### 2. Prosecution for Two Crimes

Sardeson next urges the view that the district court erred in overruling his motion to dismiss either the burglary charge or the possession charge; he argues that one cannot commit both the crimes of burglary and theft by receiving stolen property when the same property and incident form the substance of both charges.

Although he declines to phrase it thus, Sardeson's argument

is essentially that he may not be convicted both of a crime and of a lesser offense included within that crime. In this, he is correct. This court has recently reaffirmed that when a defendant is convicted of both a greater and lesser-included offense, the conviction and sentence on the lesser charge must be vacated, *State v. Olsan, ante* p. 214, 436 N.W.2d 128 (1989), for the constitutional prohibition against double jeopardy protects not only against a second prosecution for the same offense after acquittal or conviction, but also against multiple punishments for the same offense. *State v. Olsan, supra.* It is equally clear, however, that the constitutional prohibition against double jeopardy has no application where two separate and distinct crimes are committed as the result of one act, because the constitutional proscription is directed to the identity of the offense and not to the act. *State v. Rice, ante* p. 202, 435 N.W.2d 889 (1989).

Section 28-507(1) provides: "A person commits burglary if such person willfully, maliciously, and forcibly breaks and enters any real estate or any improvements erected thereon with intent to commit any felony or with intent to steal property of any value."

Section 28-517 provides: "A person commits theft if he receives, retains, or disposes of stolen movable property of another knowing that it has been stolen, or believing that it has been stolen, unless the property is received, retained, or disposed with intention to restore it to the owner."

A lesser-included offense is one which is necessarily established by proof of the greater offense. *State v. Rice, supra; State v. Arthaloney,* 230 Neb. 819, 433 N.W.2d 545 (1989); *State v. Olsan, supra.* One commits burglary in violation of § 28-507(1) when one, in the proscribed manner, breaks and enters any real property or improvements thereon with the proscribed intent; no actual theft or asportation of property is required. *State v. Zemunski,* 230 Neb. 613, 433 N.W.2d 170 (1988); *State v. Vaughn,* 225 Neb. 38, 402 N.W.2d 300 (1987). In stark contrast, one commits theft by receiving stolen property only if one "receives, retains, or disposes" of, in short, possesses, stolen movable property of another with the proscribed knowledge and intent. Clearly, burglary is not a

lesser-included offense of theft by receiving stolen property, nor is theft by receiving stolen property a lesser-included offense of burglary.

Sardeson seeks to buttress his position by citation to *Milanovich v. United States*, 365 U.S. 551, 81 S. Ct. 728, 5 L. Ed. 2d 773 (1961). *Milanovich* relied upon *Heflin v. United States*, 358 U.S. 415, 79 S. Ct. 451, 3 L. Ed. 2d 407 (1959), in which the defendant was charged under 18 U.S.C. § 2113(c) and (d) (1958). Under subsection (d), Heflin was charged with taking property by force and violence, and under subsection (c) it was alleged that Heflin did " 'receive, possess, conceal, store, and dispose' " of the same property. 358 U.S. at 416. Following conviction, consecutive sentences were imposed. The Supreme Court, after a brief review of what it characterized as "meagre" legislative history, concluded:

> From these [House and Senate] Reports it seems clear that subsection (c) was not designed to increase the punishment for him who robs a bank but only to provide punishment for those who receive the loot from the robber. We find no purpose of Congress to pyramid penalties for lesser offenses following the robbery. . . . [I]n view of the legislative history of subsection (c) we think Congress was trying to reach a new group of wrongdoers, not to multiply the offense of the bank robbers themselves.

358 U.S. at 419-20.

In *Milanovich, supra*, defendants Milanovich, husband and wife, were found guilty of "stealing several thousand dollars in currency from a commissary store at a United States Naval Base," 365 U.S. at 552; in addition, the wife was found guilty of "receiving and concealing the stolen currency," *id.*, all of these acts being crimes under 18 U.S.C. § 641 (1982). Concurrent sentences were imposed on the wife. The Supreme Court, citing *Heflin, supra*, reversed, observing: "We find nothing in the language or history of the present statute which leads to a different conclusion here." 365 U.S. at 554.

The results of *Heflin* and *Milanovich* are grounded in principles of federal statutory construction, not of constitutional jurisprudence. As the *Milanovich* Court itself noted, "the question is one of statutory construction, not of

common law distinctions." 365 U.S. at 554. See, also, *United States v. Tyler*, 466 F.2d 920 (9th Cir. 1972), *cert. denied* 409 U.S. 1045, 93 S. Ct. 544, 34 L. Ed. 2d 497, declining to apply the *Milanovich* rule to convictions for larceny and possession of the same stolen goods under § 2113(b) and (c) (1982). We are here concerned with the construction of state statutes, to which neither *Heflin* nor *Milanovich* has any relevance. Sardeson's second summarized assignment of error is without merit.

### 3. Nonsuppression of Evidence

As his third assignment of error, Sardeson takes issue with the overruling of his motions to suppress the evidence turned over to police by Tom Lillibridge and to suppress Todd Zeilinger's identification of Sardeson. In beginning the analysis of these claims, we recall that in determining the correctness of a trial court's ruling on a motion to suppress, the Supreme Court will uphold the trial court's findings of fact unless those findings are clearly erroneous. *State v. Hoer, ante* p. 336, 436 N.W.2d 179 (1989); *State v. Jolitz, ante* p. 254, 435 N.W.2d 907 (1989); *State v. Abdouch*, 230 Neb. 929, 434 N.W.2d 317 (1989). Further, in determining whether a trial court's findings on a motion to suppress are clearly erroneous, the Supreme Court does not reweigh the evidence or resolve conflicts in the evidence, *State v. Jolitz, supra*, but, rather, recognizes the trial court as the finder of fact and takes into consideration that the trial court has observed witnesses testifying in regard to such motions. *State v. Abdouch, supra*.

### a. *Lillibridge Evidence*

On March 11, 1987, Hennessey contacted Lillibridge at his place of employment, an enterprise of which Mr. Hubertus is part owner. Lillibridge accompanied Hennessey to the sheriff's office, where he spoke with several other police officers about various crimes, including the Hubertus burglary. In the course of these conversations, Lillibridge implicated Sardeson in several crimes, and, further, in Hennessey's words,

> Mr. Lillibridge had indicated to me that he had in his possession stolen property that he was not totally aware at first that it was stolen, and that he did not want to be prosecuted for possession of stolen property, at which time I referred this to [an assistant Lancaster County

attorney], and he agreed that if Mr. Lillibridge was to bring the property forward and to give information to what knowledge he had, he would not be charged.

Hennessey relayed the assistant county attorney's comments to Lillibridge, who then left the sheriff's office. At this time, it was Hennessey's understanding that Lillibridge "was going to his residence to gather up the stolen property that he had in his possession and bring [it] back in at 8:15 in the morning."

Lillibridge did in fact return to the sheriff's office the following morning with several items of property, including a bracelet later identified as belonging to Mrs. Hubertus, a videocassette recorder, and several other items, including a ski mask, a pair of green coveralls, and a BB pistol. When he brought them in, Lillibridge told police officers where he had gotten some of these items. Sardeson objected to Hennessey's testimony regarding the substance of Lillibridge's statements in this connection, and the record does not disclose precisely where, when, or under what circumstances Lillibridge acquired possession of these items. According to Hennessey, Lillibridge was neither paid nor instructed by police officers to recover evidence from Sardeson's home.

In the suppression hearing, Sardeson testified that he had invited Lillibridge into his home on the evening of March 11, 1987, that Lillibridge had been "in and out" of Sardeson's home that evening, that he did not recall Lillibridge's removing any items from the residence but that Lillibridge might have done so, and that Sardeson had never given Lillibridge a videocassette recorder or a bracelet. According to Sardeson, Lillibridge told him that he had spoken with the police earlier that day, but did not inform Sardeson that he would report back to them the next morning. Lillibridge showed Sardeson no search warrant, nor did he ask Sardeson's permission to look around. Police searches pursuant to warrant were conducted in Eagle and Lincoln on March 12, 1987, and Sardeson was arrested on the same day.

Sardeson argues that "the police recruited Mr. Lillibridge to search Mr. Sardeson's home and use the fruits of that search to get a search warrant. Evidence from that search was used in the trial against Mr. Sardeson, and all of that evidence should have

been suppressed." Brief for appellant at 20. Sardeson's argument fails for at least two reasons. In the first instance, there is nothing of record to establish that Lillibridge turned over to police on March 12, 1987, any item he had not had in his possession prior to his encounter with them on March 11. Sardeson denies that he gave Lillibridge a videocassette recorder or Mrs. Hubertus' bracelet, but this denial alone does not establish that Lillibridge acquired these items surreptitiously in the course of a visit to Sardeson's home.

More importantly, under both the fourth amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution, whether a search by a private person is actually a search by the State depends on whether the private person must be regarded as having acted as an instrument or agent of the State. *State v. Abdouch*, 230 Neb. 929, 434 N.W.2d 317 (1989). The record clearly supports the district court's implicit finding that Lillibridge was not expressly recruited by police investigators to act as their agent for purposes of conducting a warrantless search of Sardeson's residence.

Sardeson urges the view that "by talking to Lillibridge about the possibility of him being charged, and giving him a way to get out of that charge, that is by bringing good fresh evidence to the police, they made him a police agent." Brief for appellant at 20. It is true that a private person's status as a state agent in a search is not restricted to a search ordered, requested, or initiated by a state official, but may include a search which is a joint endeavor between a private person and a state official. *State v. Abdouch, supra.* It is also true, however, that some conduct by the police in advancement or inducement of the search must be proven to make out a "joint endeavor." See *State v. Abdouch, supra.* See, also, *State v. Jolitz, ante* p. 254, 435 N.W.2d 907 (1989). On these facts, the district court was not clearly erroneous in its implicit finding that any search Lillibridge may have conducted of Sardeson's residence was not conducted as a joint endeavor with police officials.

b. *Zeilinger Identification*

At the suppression hearing, Zeilinger, a neighbor of the Hubertuses', testified that on March 9, 1987, a man arrived at his residence seeking help in starting an automobile. Zeilinger

spent about 10 minutes helping this man start the automobile, using jumper cables and Zeilinger's own vehicle; this was the only time Zeilinger saw the man in question. Zeilinger testified to the same general effect at trial, adding that Sardeson's automobile was parked on a little-used path 50 to 75 yards from the Hubertuses' house, facing away from it.

Sardeson contends that Zeilinger's identification was the result of procedures which were unduly suggestive such as to lead to an irreparably mistaken identification.

Zeilinger was interviewed by Lancaster County Sheriff's Deputy Kirk Price the day after the burglary, and Zeilinger agreed to work with Lincoln Police Officer James Spanel to develop a composite sketch of the man he had seen, a task which Zeilinger accomplished later that day and in which he was not coached in any way. At the time, Spanel did not know what the investigation was about, who, if anyone, was suspected, nor that Sardeson was then involved in burglaries in general or the Hubertus burglary in particular. Price stated that before he spoke with Zeilinger, Sardeson had not been a suspect in the Hubertus burglary and that he did not know Sardeson at that time.

After completion of the composite sketch, Zeilinger was asked to pick out the man he had seen from a set of six black-and-white photographs and to do so again sometime later, using a different set of color photos. Zeilinger was asked to examine the second set of photos "due to the fact the first set of photos had such a small picture of the face and the facial features wouldn't show up quite as well in that picture [police investigators] decided to see if [they] had some better photos of close-ups of the face." According to Zeilinger, "I picked the person in each set that I thought pretty much resembled him." Although Zeilinger was "pretty sure" the man in the photos he selected was the same man who had sought his help on March 9, 1987, he was not able to say so positively, and at one point in the investigation may have indicated to police that there was only a 50-50 chance that the photos portrayed the man he had seen. However, in court during the suppression hearing, Zeilinger positively identified Sardeson, in person, as the man in question, although he indicated he was not "[a] hundred

percent sure."

Sardeson was the only person represented in both the first and second photo arrays. When Zeilinger was asked in the suppression hearing if anyone other than Sardeson was represented in both photo arrays, Zeilinger indicated that he had never before noticed one way or the other.

On April 7, 1987, Zeilinger was again asked by Price to examine a photo array, one not containing a photo of Sardeson. At this time, Zeilinger did not recognize a photo of Sardeson's roommate, Russell Harris, also considered a suspect in the Hubertus burglary.

With regard to the use of photographic arrays, this court has held that whether identification procedures were unduly suggestive and conducive to a substantial likelihood of irreparable mistaken identification is to be determined by a consideration of the totality of the circumstances surrounding the procedures. *State v. Price*, 229 Neb. 448, 427 N.W.2d 81 (1988), citing *State v. Swoopes*, 223 Neb. 914, 395 N.W.2d 500 (1986), which was overruled on other grounds in *State v. Jackson*, 225 Neb. 843, 408 N.W.2d 720 (1987) (concerning lesser offenses included in attempted crimes). Evidence of an extrajudicial identification is admissible when made under circumstances precluding the suspicion of unfairness or unreliability and where the out-of-court declarant is present at the trial and subject to cross-examination, whether or not the out-of-court declarant made a positive in-court identification. *State v. Richard*, 228 Neb. 872, 424 N.W.2d 859 (1988). See, also, *State v. Trevino*, 230 Neb. 494, 432 N.W.2d 503 (1988), applying the *Richard* rule to an extrajudicial in-person identification.

The factors to be considered in determining the likelihood of misidentification, the first aspect of the *Richard* test, are the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *State v. Trevino, supra; State v. Richard, supra.*

Sardeson is correct in stating that the facts of his case present

a closer question than have those of several cases challenging the validity of extrajudicial identification procedures recently faced by this court. See, e.g., *State v. Trevino, supra*; *State v. Price, supra*; *State v. Richard, supra*. But see, *State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986); *State v. Swoopes, supra*. Nevertheless, a review of the facts in light of the *Richard* standards demonstrates that the district court's ruling on Sardeson's suppression motion was not clearly erroneous. Zeilinger had 10 minutes in which to observe the man whose automobile he helped start, ample opportunity to commit his appearance to memory. Although Zeilinger was not as motivated to remember the man's face as were, for example, several of the eyewitnesses in *State v. Trevino, supra*, the record discloses a face-to-face conversation between the two men followed by Zeilinger's effort to render the man assistance at some inconvenience to himself. This is sufficient evidence of interested attentiveness to support the district court's determination. Zeilinger, the day following his encounter with the stalled motorist, produced a composite sketch of the man of sufficient accuracy that police personnel only tangentially involved in the case immediately recognized the person depicted as Sardeson; photographs entered into evidence independently confirm the striking resemblance the composite bears to its model. Although Zeilinger declined to represent himself as 100 percent confident of his own identification, the degree of confidence he did express was clearly sufficient to warrant submission of his evidence to the jury, particularly in light of all attendant circumstances, including the brevity of the interval between Zeilinger's observation of the man and his production of the composite sketch. In sum, the record clearly establishes satisfaction of the first branch of the *Richard* test.

Concerning the second branch of the *Richard* test, the record demonstrates that Zeilinger was present at trial and was not only "subject to" cross-examination, but was, in fact, vigorously cross-examined.

The district court's determination of Sardeson's motions to suppress the evidence taken from Lillibridge and Zeilinger's identification testimony is thus not clearly erroneous; this third summarized assignment of error is therefore also without merit.

#### 4. Exclusion of Evidence

Sardeson next assigns as error the district court's refusal to admit his expert's testimony regarding the reliability of eyewitness identifications. The admission or exclusion of evidence is a matter within the discretion of the trial court, whose ruling is not to be disturbed on appeal absent an abuse of that discretion. *State v. Olsan, ante* p. 214, 436 N.W.2d 128 (1989); *State v. Wakeman, ante* p. 66, 434 N.W.2d 549 (1989); *State v. Wilson*, 225 Neb. 466, 406 N.W.2d 123 (1987).

In an offer of proof outside the presence of the jury, Sardeson stated that if allowed to testify, his expert witness, a psychologist, "would testify about experiments where persons were shown a picture twice among many other pictures." In the words of Sardeson's attorney,

> I think that his expert opinion would be . . . that under the circumstances of this case, that is, a situation where Todd Zeilinger was shown two photographs of one person in two different photo arrays, that his identification of Mr. Sardeson at the hearing on January 4th and in this courtroom today was really an identification of the photographs that he was shown from March 10th, 1987, to today . . . as apart from and independent of and perhaps probably different than any person that he saw on March 9th, 1987, near his home.

Recently, in *State v. Trevino*, 230 Neb. 494, 432 N.W.2d 503 (1988), this court reaffirmed the rule of *State v. Ammons*, 208 Neb. 812, 305 N.W.2d 812 (1981), that it is not for an expert to suggest to a jury how a witness' testimony shall be weighed or evaluated. (See, also, *State v. Beermann, ante* p. 380, 436 N.W.2d 499 (1989), concerning the general impropriety of one witness' testifying about the weight to be given another's testimony.) The district court's determination not to admit Sardeson's proffered evidence therefore having been, far from an abuse of discretion, the only correct ruling possible, Sardeson's fourth assignment of error is clearly without merit.

#### 5. Admission of Evidence

Sardeson's fifth summarized assignment of error raises the argument that the district court erred in admitting Deputy Price's testimony concerning out-of-court statements made by

Zeilinger.

In his opening remarks to the jury, Sardeson's counsel stated:

> The piece of evidence that we're going to challenge very strongly is Mr. Zeilinger. . . .
>
> . . . [T]he evidence will show that before a composite drawing was done, Mr. Sardeson was already a suspect in this burglary because of his relation to a man named Tom Lillibridge . . . . I think the evidence will show that the people that did the composite knew that Mr. Sardeson was a suspect. . . .
>
> . . . .
>
> . . . [W]e will submit to you at the end of the evidence that what Mr. Zeilinger was doing was not identifying Mr. Sardeson but identifying Mr. Sardeson's picture that he had seen quite a number of times.

During the trial, Price, over Sardeson's continuing objection, was permitted to testify regarding the conversations he had with Zeilinger on March 10, 1987, as detailed in part II(3)b above, "[n]ot . . . for the truth of what was said but for the purpose of explaining conduct of this witness at a later time." Price further testified that at the conclusion of the interview, he asked Zeilinger to accompany him to the police station and to assist in the preparation of a composite sketch of the person whose vehicle Zeilinger had helped start. Zeilinger did so, and a sketch of a suspect in the Hubertus burglary was subsequently prepared. According to Price, once the composite was finished, Officer Spanel, who had assisted Zeilinger in creating the composite sketch, remarked, outside of Zeilinger's hearing, that the sketch resembled Sardeson. Price subsequently composed a photo array using six black-and-white photographs from sheriff's department files and showed them to Zeilinger, who picked Sardeson's photo as one that "he said was the closest to the individual he saw the day before, that he was probably 50-50 with that individual." Ten minutes later, Price constructed a second photo array, using color photos with larger face sizes, and Zeilinger again picked Sardeson's photo as resembling the man he had helped.

Neb. Rev. Stat. § 27-801 (Reissue 1985) sets forth the classical definition of "hearsay" as "a statement, other than

one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." It is a legal commonplace that that which is not offered "to prove the truth of the matter asserted" is not hearsay. See *State v. Wilson*, 225 Neb. 466, 406 N.W.2d 123 (1987).

In his opening remarks, Sardeson's attorney placed the investigating officers' knowledge, and by implication their motives, at issue. The district court properly received Price's testimony, not for the truth of the statements made by Zeilinger to Price but, rather, to show how the investigation evolved, in rebuttal of Sardeson's implicit allegation that the police somehow manipulated Zeilinger into identifying Sardeson. Received for this purpose, Price's testimony was not within the definition of hearsay, and the district court clearly was not in error so to conclude. Sardeson's fifth assignment of error is without merit.

### 6. No Mistrial

Sardeson's sixth summarized assignment of error takes issue with the district court's refusal to grant a mistrial based on the State's conduct in interrogating Heinz Matthiesen. The decision to grant a motion for mistrial is within the discretion of the trial court and will be upheld on appeal absent a showing of abuse of discretion. *State v. Byrd, ante* p. 231, 435 N.W.2d 898 (1989); *State v. Jackson, ante* p. 207, 435 N.W.2d 893 (1989); *State v. Fraser*, 230 Neb. 157, 430 N.W.2d 512 (1988).

Matthiesen, a retired maintenance supervisor and amateur collector of and dealer in coins and precious metals, testified that over a period of several days following the Hubertus burglary, Sardeson sold him several items, principally rings, rare coins, some rare currency, and jewelry, later identified as taken in that burglary. The colloquy to which Sardeson now objects took place as Matthiesen was describing the conclusion of his second meeting with Sardeson, at which Matthiesen purchased, among other things, Mrs. Hubertus' wedding ring:

> [Matthiesen] I paid him the money, and he left. And when he left I walked outside, and I saw — I have an alley with a six-foot redwood fence, and I saw the tail end of a reddish maroon [Camaro] taking off down the alley. I

couldn't —

Q. Are you sure it's a [Camaro]?

[Matthiesen] To the best of my knowledge.

Q. And it wasn't a Monte Carlo?

[Matthiesen] A Monte Carlo, I mean. I'm sorry.

Although this is the only portion of the exchange Sardeson notes in his brief in this court, the record shows that the colloquy continued as follows:

[Sardeson's attorney] Your Honor, he's testified that it was a [Camaro], and now the prosecutor is trying to get him to change his testimony to another kind of automobile.

[State's attorney] Your Honor, I'm trying to see whether or not he's sure of what he said.

THE COURT: Well, you don't need to do it that way.

[Matthiesen] Sir, I made a mistake. I meant a Monte Carlo.

THE COURT: All right.

[State's attorney] Are you sure of that? It was a Monte Carlo?

[Matthiesen] I'm not sure, but in my opinion it was a Monte Carlo.

Immediately following this exchange, Sardeson moved for a mistrial, which motion the district court overruled.

Recently, in *State v. DeGroot*, 230 Neb. 101, 430 N.W.2d 290 (1988), this court stated the standard for determining whether declaration of a mistrial is appropriate: " 'In order to prevent defeat of justice or to further justice during a jury trial, a mistrial is generally granted at the occurrence of a fundamental failure preventing a fair trial in the adversarial process. Some examples are an egregiously prejudicial statement by counsel . . . .' " *Id*. at 105, 430 N.W.2d at 293 (quoting *State v. Archbold*, 217 Neb. 345, 350 N.W.2d 500 (1984)). See, also, *State v. Byrd, supra*; *State v. Jackson, supra*. The conduct by the prosecutor of which Sardeson now complains hardly rises to the level of "fundamental failure preventing a fair trial." Indeed, the prosecutor's effort to correct his witness' misdescription by leading questions is clearly, on this record, inconsequential. Although the description of Sardeson's automobile was

apparently intended by the prosecutor to serve, howsoever weakly, as circumstantial evidence of Sardeson's identity, the fact is that Sardeson's identity was more than adequately proven by in-court eyewitness identifications by Matthiesen and Zeilinger. The model of automobile Matthiesen observed mattered not one whit, and the district court was well within its discretion so to conclude. Sardeson's sixth summarized assignment of error is without merit.

### 7. Proof of Habitual Criminal Status

Finally, Sardeson urges the view that the district court erred in finding that the State had borne its burden to prove, for enhancement of sentence pursuant to Neb. Rev. Stat. § 29-2221 (Reissue 1985), this state's habitual criminal statute, that he is the same Patrick A. Sardeson who had been previously convicted of felonies. In the absence of a sentencing court's abuse of discretion, the sentencing court's procedure utilized for presentation of information at a hearing for imposition of the habitual criminal penalty prescribed by § 29-2221 will be sustained on appeal. *State v. Jackson*, 225 Neb. 843, 408 N.W.2d 720 (1987).

In the pretrial suppression hearing of January 4, 1988, Sardeson testified on cross-examination as follows: "Q. Sir, have you ever been convicted of a felony within the last ten years? [Sardeson] The last ten years? Q. Yes. [Sardeson] Yes. Q. And how many? [Sardeson] Three." Following trial, in a hearing to determine the applicability of § 29-2221 to Sardeson's sentencing in these cases, the State offered three authenticated records of prior felony convictions in the name of "Patrick Sardeson." Sardeson objected, as he does in this court, "to their being introduced until there's some connection between the person named in those exhibits and the defendant." The State asked the district court to note that Sardeson had identified himself as "Patrick Sardeson" in testimony in the suppression hearing; with no objection by Sardeson, the district court did so. Neither side offered any additional evidence. On this basis, the district court announced its specific finding that "defendant has been twice previously convicted of felonies and sentenced and committed by courts of this state. Therefore, defendant is deemed to be an habitual criminal and shall be

sentenced in both cases accordingly."

Neb. Rev. Stat. § 29-2222 (Reissue 1985) provides as follows:

> At the hearing of any person charged with being an habitual criminal, a duly authenticated copy of the former judgment and commitment, from any court in which such judgment and commitment was had, for any of such crimes formerly committed by the party so charged, shall be competent and prima facie evidence of such former judgment and commitment.

This court has previously held that under § 29-2222, an authenticated record establishing a prior conviction of a defendant with the same name is prima facie sufficient to establish identity for the purpose of enhancing punishment and, in the absence of any denial or contradictory evidence, is sufficient to support a finding by the court that the accused has been convicted prior thereto. *State v. Jackson, supra.* See, also, *State v. Wakeman, ante* p. 66, 434 N.W.2d 549 (1989). Sardeson neither denied that he was the person sentenced for the prior felonies alleged, nor did he seek to establish by contradictory evidence that he was not the person so named. Rather, Sardeson contends that the State failed to meet its burden of proof in this regard, a contention in which he is clearly mistaken. We need not, and do not, consider the implication of Sardeson's express admission in the suppression hearing to conclude that the trial court committed no abuse of discretion. Sardeson's seventh and final summarized assignment of error is, like those which have preceded it, without merit.

### III. DECISION

The record sustaining none of Sardeson's summarized assignments of error, the judgment of the district court is affirmed.

AFFIRMED.